**THE FEDERAL INSURANCE CO., Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE CO., Defendant.**

**No. 99 Civ. 10094(WHP).**

United States District Court,
S.D. New York.

March 30, 2001.

Thomas E. Mehrtens, Downing & Mehrtens, P.C., New York, New York, for Plaintiff.

Marshall T. Potashner, Liberty Mutual Insurance Company, New York, New York, for Defendant.

### MEMORANDUM & ORDER

PAULEY, District Judge.

In this diversity action, plaintiff Federal Insurance Company ("Federal"), an excess

liability insurer, alleges that defendant Liberty Mutual Insurance Company ("Liberty"), a primary insurer, acted in bad faith by failing to offer the maximum coverage of its policy to settle a lawsuit. Liberty moves for summary judgment dismissing the complaint. For the reasons set forth below, Liberty's motion for summary judgment is granted.

## BACKGROUND

The following facts are not disputed. In 1988, two-year-old Joel Garcia fell six floors from an apartment window when the spring-tension window guard gave way. (Def.'s 56.1 Stmt. ¶ 4.) As a consequence of the fall, he suffered a fractured skull. (Def.'s 56. 1 Stmt. ¶ 11.) On January 8, 1990, he and his mother Mercedes Garcia (collectively, the "Garcias") filed a negligence action in New York State Supreme Court against their landlord Thayer Realty Company and its principals Florence and Michael Edelstein (collectively "Thayer") for $1,500,000 in damages.[1] (Def.'s 56.1 Stmt. ¶¶ 2–3, 5.)

Thayer held a $1 million primary insurance policy with Liberty and $5 million excess coverage with Federal. (Def.'s 56.1 Stmt. ¶¶ 9, 10.) After reviewing the claim, Liberty authorized settlement during the pendency of the litigation on an incremental schedule as follows:

| Time Interval | Amount Authorized |
|---|---|
| October 1, 1990 to July 19, 1991 | $ 150,000 |
| July 19, 1991 to September 16, 1993 | $ 250,000 |
| September 16, 1993 to October 19, 1998 | $ 350,000 |
| October 19, 1998 to December 4, 1998 | $ 750,000 |
| December 4, 1998 to June 15, 1999 | $1,000,000 |

(Aff. of Arthur McNamee, dated Apr. 27, 2000, ("McNamee Aff.") ¶ 19.) The parties conducted discovery for more than two years before broaching settlement. (*See*

(Affidavit of Marshall Potashner ("Potashner Aff.") Ex. D ("Claim File"): Remark 50.) On April 10, 1992, the Garcias' counsel made a settlement demand exceeding $1 million. (Claim File: Remark 59.) Deeming that demand "outrageous," Liberty deferred making a counteroffer until it reviewed Garcia's physical examination report. (McNamee Aff. ¶ 28; Claim File: Remark No. 62.) More than four months later, on August 25, 1992, Liberty received that report. (McNamee Aff. ¶ 29.)

The physical examination report concluded that Joel Garcia had sustained significant cerebral trauma. While he had not exhibited any developmental problems before the accident, the report revealed that he now lagged behind other first graders in cognitive development, struggled with basic reading and writing, and could not calculate simple arithmetic "such as 2 + 2." (Claim File: Remark No. 65.) More than one year later, Liberty attempted to initiate settlement discussions with the Garcias' attorney but those overtures were · rejected. (McNamee Aff. ¶ 32; Claim File: Remark Nos. 83–87, 96). On December 3, 1993, the Garcias' attorney filed a note of issue placing the action on the state court's trial calendar. In May 1994, the Garcias' attorney again declined to discuss settlement and instead advised Liberty that he preferred to let the case develop. (Claim File: Remark 96.)

Despite the filing of a note of issue, discovery apparently continued, and the prospect of avoiding liability became bleaker for Liberty. On October 20, 1997, Liberty was advised by its counsel that New York City Board of Health Code Regulation 131.15 ("Regulation 131.15") imposed on Thayer a duty to install screw-in window guards in any apartment where the

---

1. Joel Garcia sought $1,000,000 for his injuries and Mercedes Garcia sought $500,000 for

medical expenses. (Def.'s 56.1 Stmt. ¶ 5.)

landlord had ascertained that children under ten years of age resided. (*See* Affirmation of Thomas E. Mehrtens ("Mehrtens Aff.") Ex. 3: Palermo Letter at 2 .) Thayer's building superintendent testified at deposition that he knew the window guard in the Garcias' apartment did not meet Regulation 131.15's standards. That concession undermined Thayer's affirmative defense that the landlord had acted reasonably. (Mehrtens Aff. Ex. 3: Palermo Letter at 1.)

On January 19, 1998, Liberty made its first counteroffer to the Garcias in an amount worth $175,000.[2] (Def.'s Rule 56.1 Stmt. ¶ 34.) Two days later the Garcias responded with a new settlement proposal of $1.2 million. (Def.'s 56.1 Stmt. ¶¶ 35–36.) In February 1998, Charles Stark ("Stark"), Liberty's in-house counsel, recommended that Liberty offer a settlement in the range of $250,000. (Def.'s Rule 56.1 Stmt. ¶¶ 39–40.) On March 2, 1998, Liberty contacted Federal to advise that the Garcias' $1.2 million demand stated a $200,000 excess claim. (Def.'s Rule 56.1 Stmt. ¶ 40.)

By memorandum dated March 13, 1998, Arthur McNamee, a Liberty insurance claims specialist, valued the Garcias' case at $1,024,500 and concluded that a jury would likely attribute fifty percent of the liability to Mercedes Garcia.[3] Consequently, McNamee recommended a settlement offer of $512,250. (Potashner Aff. Ex. G: Pricing Memo.) On April 23, 1998, Liberty increased its settlement offer to the Garcias' counsel to $199,358. (Potashner Aff. Ex. H: Structured Settlement

dated Dec. 15, 1998.) However, the Garcias did not budge from their $1.2 million demand. (McNamee Aff. ¶ 52.) On May 19, 1998, Liberty forwarded a copy of its claim file to Federal. (Def.'s Rule 56.1 Stmt. ¶ 54–55.) On August 5, 1998, Stark concluded that Liberty faced "virtual strict liability" given Thayer's admitted awareness of Joel Garcia. (Mehrtens Aff. Ex. 4: Stark Letter at 1.) Stark acknowledged that in Liberty's worst case scenario, it faced a potential seven-figure damages award. (Mehrtens's Aff. Ex. 5: Stark Deposition at 16, 21.)

Jury selection began on November 2, 1998. By that time, Liberty had authorized a settlement cap of $750,000. (Def.'s Rule 56.1 Stmt. ¶ 65.) On November 4, 1998, Liberty tendered a $300,000 settlement offer to Garcias' counsel who responded by reiterating plaintiffs' $1.2 million demand. (Def.'s Rule 56.1 Stmt. ¶ 67.) On November 18, the second day of trial, Liberty increased its offer to $400,000, only to be rebuffed again by the Garcias' counsel. (Def.'s Rule 56.1 Stmt. ¶ 73.) At an impromptu November 25, 1998 settlement conference, the trial judge suggested that Liberty offer $700,000; however, the Garcias' counsel refused to lower plaintiffs' $1.2 million demand. (Def.'s Rule 56.1 Stmt. ¶¶ 76–77.) While the jury was deliberating, Liberty increased its settlement offer to $600,000. (Def.'s Rule 56.1 Stmt. ¶¶ 73, 75.) Before the Garcias responded, the jury returned a plaintiffs' verdict in the amount of $2,548,350. (Def.'s Rule 56.1 Stmt. ¶¶ 76, 86.) After trial, Federal and the Garcias agreed to settle for $2.3 million. Liberty paid $1 million plus

---

2. Settlement offers tendered by Liberty had three relevant figures: the present value, the guaranteed payout, and the lifetime expected yield. For example, Liberty's January 19, 1998 settlement offer had a $175,000 present value, a $287,733 guaranteed payout, and a lifetime expected yield of $410,998. (McNa-mee Aff. ¶ 35.) The settlement figures stated in this motion are the present value figures.

3. Prior to trial, Liberty's counsel determined that a defense of contributory negligence based on negligent supervision was not actionable under New York law.

$37,500 in interest, and Federal paid the remaining $1,262,500. This action followed.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The burden of demonstrating the absence of any genuine dispute as to a material fact rests with the moving party. *See, e.g., Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Grady v. Affiliated Cent., Inc.,* 130 F.3d 553, 559 (2d Cir.1997). In evaluating the record to determine whether there is a genuine issue as to any material fact, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. If the moving party meets its initial burden, the non-moving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-moving party must "do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986).

### II. New York's Bad Faith Standard

 "Because an insurance company has exclusive control over a claim against its insured once it assumes defense of the suit, it has a duty under New York law to act in 'good faith' when deciding whether to settle such a claim, and it may be held liable for breach of that duty." *Pinto v. Allstate Ins. Co.,* 221 F.3d 394, 398 (2d Cir.2000); *see also Pavia v. State Farm Mut. Automobile Ins. Co.,* 82 N.Y.2d 445, 452, 605 N.Y.S.2d 208, 211, 626 N.E.2d 24 (1993). This duty also applies to those situations where an excess insurer is exposed to liability. *See Forest Ins., Ltd. v. Am. Motorists Ins. Co.,* No. 89 Civ. 4326(BN), 1994 WL 97138, at *13 (S.D.N.Y.1994). A primary insurer acts in good faith when it gives equal consideration to the excess insurer's interest in avoiding a judgment in excess of the primary policy's limit as it does to its own interests in considering plaintiff's demand to settle a lawsuit. *See Pinto,* 221 F.3d at 398; *Pavia,* 82 N.Y.2d at 453, 605 N.Y.S.2d at 211, 626 N.E.2d 24. This duty of good faith stems from the "an inherent conflict" between the primary insurer's desire to settle the claim for as little as possible and the excess insurer's desire to avoid liability. *Smith v. Gen. Accident Ins. Co.,* 91 N.Y.2d 648, 653, 674 N.Y.S.2d 267, 270, 697 N.E.2d 168 (1998) (insurer's failure to inform insured of settlement offers evidenced bad faith).

 The duty of good faith is not breached by an insurer's mistake in judgment or negligence. *See Pinto,* 221 F.3d at 398; *Pavia,* 82 N.Y.2d at 453, 605 N.Y.S.2d at 211, 626 N.E.2d 24. Instead, a plaintiff must establish that the insurer demonstrated a "gross disregard" of its policyholder's interests. In order to establish "gross disregard," Federal must demonstrate that Liberty's conduct involved a "deliberate or reckless failure to place on equal footing the interests of [Federal] with its own interests when considering a

settlement offer." *Pinto*, 221 F.3d at 399 (citing *Pavia*, 82 N.Y.2d at 453, 605 N.Y.S.2d at 211, 626 N.E.2d 24); *see also Yonkers Contracting Co. v. General Star Nat'l Ins. Co.*, 14 F.Supp.2d 365, 371 (S.D.N.Y.1998). Such failure can be shown by "a pattern of behavior evincing a conscious or knowing indifference to the probability that an [excess insurer] would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted." *Pinto*, 221 F.3d at 399; *see also Pavia*, 82 N.Y.2d at 453, 605 N.Y.S.2d at 211–12, 626 N.E.2d 24.

■■■ There is no formula to determine whether an insurer acted in good faith. *See Pinto*, 221 F.3d 394, 399 (citing *Peterson v. Allcity Ins. Co.*, 472 F.2d 71, 77 (2d Cir.1972)). Among the factors this Court must consider are "plaintiff's likelihood of success on the issue of liability, the potential damages award, the financial burden on each party if the insurer refuses to settle, whether the claim was properly investigated, the information available to the insurer when the demand for settlement was made, and, finally, any other relevant proof tending to establish or negate the insurer's good faith in refusing to settle." *Pinto* 221 F.3d at 400 (citing *Pavia*, 82 N.Y.2d at 454–55, 605 N.Y.S.2d at 212, 626 N.E.2d 24). From these factors, the Court will determine if there is a high probability that the excess insurer would be subject to personal liability because of the insurer's actions, and whether the excess verdict reasonably could have been predicted. *See Pinto*, 221 F.3d at 399 (citing *Brockstein v. Nationwide Mut. Ins. Co.*, 417 F.2d 703, 707 (2d Cir.1969)).

III. *Application of the Bad Faith Standard*

Federal limits its allegations of misconduct to Liberty's settlement efforts from September 1998 to the December 2, 1998 jury verdict. (Mehrten's Aff. at 28.) The gravamen of Federal's claim is that when it became apparent that the Garcias' attorney would not accept a settlement less than $1.2 million, Liberty acted in bad faith by failing to appreciate the exposure of the excess carrier. (Mehrten's Aff. at 21.)

Liberty asserts that summary judgment is warranted for two reasons: (1) Liberty never had an actual opportunity to settle for less than $1 million; and (2) even if Liberty had an opportunity to settle, its decision to offer less than the $1 million dollar policy limit does not constitute bad faith.

Liberty maintains that there was no actual opportunity to settle within the $1 million policy limit because the Garcias never demanded less than $1.2 million after September 1998. (Def.'s Mem. in Supp. at 21.) Federal counters that Liberty could have settled for $1 million because Federal was willing to pay the excess $200,000. (Pl.'s Mem. in Opp. at 7.)

■■■ Liberty had a duty to apprise Federal of demands in excess of $1 million in the event that Federal was willing to pay the excess. *See Smith*, 91 N.Y.2d at 652, 674 N.Y.S.2d at 269, 697 N.E.2d 168 (1998) (liability insurer's failure to keep its insured informed of settlement offers in excess of its policy can constitute some evidence that it acted in bad faith in refusing to settle the claim); *see also Brockstein v. Nationwide Mut. Ins. Co.*, 417 F.2d 703, 707–08 (2d Cir.1969).

Although both parties were aware of the $1.2 million demand, Federal never offered $200,000 to cover the excess. Federal had frequent communication with Liberty concerning this case and claims that it was willing to contribute $200,000 to the settlement but did not because Liberty's settle-

ment offers were never close to its policy limit of $1 million. That assertion raises a question of fact that precludes summary judgment on the first branch of Liberty's motion.

■ Nevertheless, summary judgment on the second branch of Liberty's motion is warranted because Liberty's conduct does not meet the high standard of "gross disregard" required under New York law.

■ While Liberty never seriously contested Thayer's liability, the record is clear that it disputed the magnitude of the damages. An insurer's right to contest claims applies to the damages as well as liability. *Allstate v. Jacobs*, 208 A.D.2d 578, 617 N.Y.S.2d 360, 361 (2d Dep't 1994); *see, e.g., Pavia*, 82 N.Y.2d at 454, 605 N.Y.S.2d at 212, 626 N.E.2d 24 ("[A]n insurer cannot be compelled to concede liability and settle a questionable claim simply because an opportunity to do so is so presented."). The potential for a large plaintiff's verdict does not render an insurer's settlement posture unreasonable so long as the insurer's course was informed by a defensible rationale. *See Employer's Mut. Cas. Co. v. Key Pharm., Inc.*, 871 F.Supp. 657, 670–71 (S.D.N.Y.1991) ("[T]here are some cases that can be settled for a certain sum of money, even though liability does not warrant such a settlement, and even though there is a prospect for a substantially larger award."); *see Forest Ins.*, 1994 WL 97138, at *13 ("[A]n insurer is not obligated to settle in order to avoid liability for bad faith simply because the demand is within the policy limits."). Here, Federal offers no evidence in its unsworn affirmation to suggest that Liberty unreasonably assumed that its case could be defended on the damages issue.

The record demonstrates that Liberty dutifully prepared for the trial by deposing witnesses, reviewing and critiquing the Garcias' expert reports, and retaining three defense experts to prepare physical, psychological, and neurological reports to contest damages. (*See* Claim File: Remark 261, Potashner Aff. Ex. M: Wiesen Deposition.) Liberty followed the trial evaluating both the jury and the Garcias' counsel, and believed that a verdict within the policy limit was a strong possibility. (Claim File: Remarks 176, 305, 313–315, 392.)

Moreover, even after the contributory negligence defense had been discounted, Stark advised Liberty that there was a fifty percent chance that the verdict would not exceed $600,000 because of the difficulty proving causation. Liberty's expert witnesses testified that Garcia's fall did not cause his learning disability. (McNamee Aff. ¶ 17, Potashner Aff. Ex. M: Wiesen Deposition.) Liberty's critique of causation was bolstered by disclosure of several potential intervening factors including incidents where Garcia drank kerosene as a toddler and was struck by an automobile. In addition, Garcia was removed from his home by New York authorities based on allegations of parental neglect. Even the Garcias' counsel believed that causation was a close issue and at a deposition in this action he acknowledged that an expert witnesses was reluctant to testify on causation until shortly before trial. Moreover, Federal's own claims specialist concluded that plaintiff's learning disability may not have been caused by the fall. (Potashner Aff. ¶ 17.)

Federal's only argument is that Liberty should have settled for the full policy amount once it became clear that the Garcias' would not retreat from their $1.2 million dollar demand. However, Federal undermines its own argument by acknowledging the obvious: "It certainly was unusual that a plaintiff's attorney would be up front with an insurance company about his settlement demand rather than play

the usual negotiating game of demanding millions of dollars more than was actually wanted." (Mehrten's Aff. at 20.) Assuming that the Garcias were inflexible in their $1.2 million demand, Liberty's failure to appreciate that fact was an error in judgment only cognizable in hindsight. Its conduct did not rise to the level of "gross disregard" required by New York law. Liberty's strategy of gradually increasing its offer in an effort to persuade the Garcias to lower their demand is not an uncommon method of resolving litigation. The record is bereft of evidence to support Federal's claim that Liberty acted with "gross disregard" of Federal's liability.

Liberty's bare-bones application for attorney's fees is denied.

### CONCLUSION

For the reasons set forth above, the Liberty's motion for summary judgment dismissing the complaint is granted and its motion for attorneys' fees is denied. The Clerk of the Court is directed to close this case.