**NEW ENGLAND INSURANCE CO., Plaintiff,**

v.

**HEALTHCARE UNDERWRITERS MUTUAL INSURANCE, Defendant.**

No. 98–CV–2234.

United States District Court, E.D. New York.

June 26, 2001.

---

Rivkin, Radler & Kremer, LLP by David Richman and Lee S. Siegel, Uniondale, NY, for Plaintiff.

Mcaloon & Friedman, PC by Lawrence W. Mumm, Gillian Fisher and Timothy J. O'Shaughnessy, New York City, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

In this case, a jury has found that a casualty carrier, insuring a hospital in a medical malpractice case, is liable for "bad faith" for refusing to settle a case in which the injuries in the underlying action were devastating, and would expose the carrier to substantial damages well in excess of its coverage, but where the liability against the hospital was sharply disputed. This case of original impression, presents the question of whether a bad faith claim in

New York State requires the plaintiff to prove, as an element of the cause of action, that the insured's liability was clear—that is "all serious doubts about the insured's liability were removed"—at a time when an offer to settle within the policy limits was refused by the carrier. In addition, the Court also addresses the novel question of the proof required to show that an offer to settle within the policy limits was in fact made.

This case was tried before a jury from November 27, 2000 to December 20, 2000, at which time the jury returned a verdict in favor of the Plaintiff New England Insurance Co. ("New England"), for damages stipulated to be $1.1 million. Following the verdict, the Defendant, Healthcare Underwriters Mutual Insurance Co. ("Healthcare") moved for judgment as a matter of law under Fed.R.Civ.P. 50, contending that New England had failed to establish the required element of "clear liability." New England cross-moved for an award of pre-judgment interest. Oral argument on these motions was held on May 4, 2001.

### BACKGROUND

In 1985, David Weinstock was born in Huntington Hospital with catastrophic birth defects, in that he was severely brain damaged. Weinstock's parents commenced a malpractice action ("the Weinstock action") in Supreme Court, Suffolk County, against, among other parties, Dr. Lawrence Horn, the obstetrician involved, and Huntington Hospital ("the Hospital"). Healthcare was the primary liability insurer of the Hospital, covering the first $ 1 million in claims, while New England provided excess insurance in the additional sum of $ 3 million. The Healthcare policy required that the Hospital consent to any settlement.

On or about February 23, 1991, prior to the trial of the Supreme Court action, the Weinstocks settled with Dr. Horn for the sum of $1.2 million, leaving the Hospital as the only defendant. Although there were settlement discussions between Healthcare and the Weinstocks, as discussed in more detail below, the parties were unable to resolve the case, in that Healthcare made no offer. On September 1, 1992, the jury in the Weinstock action returned a verdict against the Hospital, and awarded damages of $ 9.6 million, 25% of which were attributable to the Hospital, resulting in the sum of $2.4 million being apportioned to the Hospital. In post-verdict settlement discussions, the Weinstocks accepted $ 2.1 million in satisfaction of the verdict against the Hospital. Healthcare paid its full $ 1 million under its policy, and New England paid the remaining $ 1.1 million as required by the excess policy. New England then commenced this action against Healthcare, alleging that Healthcare had an opportunity to settle the case within its policy limits prior to and during the underlying trial and refused to do so; and that such a refusal rendered Healthcare liable under the doctrine of "bad faith."

The primary evidence on the issues presently before the Court was provided by Steven Pegalis, the Weinstocks' trial counsel in the latter part of the Supreme Court trial. Pegalis testified that in January 1991, when the Weinstocks were negotiating a settlement with Dr. Horn, their demand to settle to the Hospital was $500,000. By February 1991, after the Weinstocks had reached a settlement with Dr. Horn, leaving the Hospital as the only remaining defendant, their demand to the Hospital had risen to $1 million, although Pegalis testified that he would have "seriously considered" recommending to his client an offer as low as $850,000.

Once the trial began, the Weinstocks' settlement demand to the Hospital rose to

$2 million, and prior to the jury returning with a verdict, Pegalis increased the settlement figure to $4 million, representing the total coverage of both insurance policies. However, Pegalis testified that, at the conclusion of the plaintiff's case, he would have "recommended" a settlement of $ 1 million had it been offered. Healthcare never made any settlement offer at any time prior to the verdict. However, the evidence in the trial before this Court establishes that the Hospital had an arguably viable defense on the liability issue throughout the Weinstock trial—specifically, (i) that David Weinstock's injuries were suffered prior to the birth while *in utero* or during delivery, when Dr. Horn, the obstetrician, was on the scene and fully in charge, and (ii) that the Hospital had no vicarious responsibility for the actions of Dr. Horn, the attending physician.

For the purposes of this opinion, the Court assumes that a reasonable jury could find, as a fact, that prior to and during the Weinstock trial to the conclusion of the plaintiffs' case, Healthcare could have settled the claim against the Hospital for $1 million or less, with the consent of the Hospital.

Following the close of proof in this trial, this Court initially informed the attorneys for the parties that, in accordance with the seminal case of *Pavia v. State Farm Mutual Automobile Ins. Co.,* 82 N.Y.2d 445, 454, 605 N.Y.S.2d 208, 212, 626 N.E.2d 24 (1993), it intended to charge the jury that New England had the burden of proving that (i) Healthcare had an opportunity to settle the case within its policy limits; (ii) that the Hospital would have consented to the settlement; and (iii) that the Hospital's liability was "clear" at that time. New England's counsel objected to the Court's proposed instruction, and stated that the *Pavia* case also set forth a multi-factor balancing test, which required the jury to

consider, among other things, "the likelihood of success on the liability issue in the underlying action." *Id.,* 82 N.Y.2d at 454–55, 605 N.Y.S.2d at 212, 626 N.E.2d 24. Upon further consideration, this Court reversed its earlier ruling, and instructed the jury to consider the probability of success on the merits, stating that "the third issue you must consider is whether the plaintiff New England proved that it was probable [...] that the jury would find a verdict in favor of the Weinstocks against the Huntington Hospital." The Court did not charge the jury that New England must prove that the liability against the Hospital in the underlying action had to be "clear" at the time that an offer was made by the Weinstocks to settle within the policy limits.

## DISCUSSION

■ A court decides a motion for judgment as a matter of law under Fed. R.Civ.P. 50(a)(1) using the same standard that applies to motions for summary judgment. *See Alfaro v. Wal–Mart Stores, Inc.,* 210 F.3d 111 (2d Cir.2000). As stated recently by the United States Supreme Court in *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000),

> Rule 50 requires a court to render judgment as a matter of law when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue... The standard granting summary judgment "mirrors" the standard for judgement as a matter of law, such that "the inquiry under each is the same..." It therefore follows that, in entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however,, the court must draw all reasonable inferences in

favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. That is, the court should give credence to the evidence favoring the nonmovant as well as that "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."

530 U.S. at 149–151, 120 S.Ct. at 2109–10 (citations omitted). Stated differently,

[O]n a motion for a judgment as a matter of law after a jury verdict, or on appeal after trial, the question is always whether, after "drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is sufficient evidence to permit a rational juror to find in his favor." *Sir Speedy, Inc. v. L & P Graphics Inc.*, 957 F.2d 1033, 1039 (2d Cir.1992); *see also Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 ("[T]he judge must ask ... whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented [,] ... whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict...."); *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 200 (2d Cir.1999) (standard to grant summary judgment is whether there is "sufficient evidence for a reasonable jury to conclude that [defendant] discriminated.")

*McCarthy v. New York City Technical College*, 202 F.3d 161(2d Cir.2000).

■ Under New York law, a primary insurer owes an excess insurer the same duty of good faith that it owes to its insured. *Pavia*, 82 N.Y.2d at 452, 605 N.Y.S.2d at 211, *quoting St. Paul Fire & Marine Ins. Co. v. United States Fid. & Guar. Co.*, 43 N.Y.2d 977, 404 N.Y.S.2d 552, 375 N.E.2d 733 (1978); *Hartford Accident & Indem. Co. v. Michigan Mutual Ins. Co.*, 93 A.D.2d 337, 462 N.Y.S.2d 175 (1st Dept.1983), *aff'd*, 61 N.Y.2d 569, 475 N.Y.S.2d 267, 463 N.E.2d 608 (1984).

## A. As to the requirement of the Plaintiff to prove "clear liability"

■ Turning to Healthcare's motion for judgment as a matter of law, the first crucial issue before the Court is whether, referring to the underlying action, "clear liability" is an indispensable element in a bad faith insurance claim under New York State law, or whether the proper standard is a multi-factor test weighing, among other things, "probability of success." These two concepts, while sounding similar at first blush, are entirely different, as will be seen later in this opinion.

The Court's starting point is, naturally, the leading decision of the New York Court of Appeals in *Pavia:*

**It is settled that an insurer "cannot be compelled to concede liability and settle a questionable claim"** (*St. Paul,* supra, 43 N.Y.2d at 978, 404 N.Y.S.2d 552, 375 N.E.2d 733) simply "because an opportunity to do so is presented" (*Knobloch v. Royal Globe Ins. Co.*, 38 N.Y.2d 471, 479, 381 N.Y.S.2d 433, 344 N.E.2d 364). **Rather, the plaintiff in a bad-faith action must show that "the insured lost an actual opportunity to settle the * * * claim"** (*Copfer, supra,* 48 N.Y.2d at 873, 424 N.Y.S.2d 356, 400 N.E.2d 298) *at a time when all serious*

doubts about the insured's liability were removed (*St. Paul, supra,* 43 N.Y.2d at 978, 404 N.Y.S.2d 552, 375 N.E.2d 733; *DiBlasi, supra,* 147 A.D.2d at 98–99, 542 N.Y.S.2d 187).

**Bad faith is established only "where the liability is clear** and the potential recovery far exceeds the insurance coverage" (*DiBlasi, supra,* 147 A.D.2d at 98, 542 N.Y.S.2d 187). However, it does not follow that whenever an injury is severe and the policy limits are significantly lower than a potential recovery the insurer is obliged to accept a settlement offer. The bad-faith equation must include consideration of all of the facts and circumstances relating to whether the insurer's investigatory efforts prevented it from making an informed evaluation of the risks of refusing settlement. In making this determination, courts must assess the plaintiff's likelihood of success on the liability issue in the underlying action, the potential magnitude of damages and the financial burden each party may be exposed to as a result of a refusal to settle. Additional considerations include the insurer's failure to properly investigate the claim and any potential defenses thereto, the information available to the insurer at the time the demand for settlement is made, and any other evidence which tends to establish or negate the insurer's bad faith in refusing to settle. The insured's fault in delaying or ceasing settlement negotiations by misrepresenting the facts also factors into the analysis (see, *Lozier v. Auto Owners Ins. Co.,* 951 F.2d 251, 254 [9th Cir. 1991], *supra*; see also, 14 Couch, Insurance 2d § 51:137 [rev ed]).

82 N.Y.2d at 454–455, 605 N.Y.S.2d at 212, 626 N.E.2d 24 (emphasis added).

This language appears to be somewhat inconsistent. On the one hand, *Pavia* states that "bad faith only exists where liability is clear," which is defined as being "at a time when all serious doubts about the insured's liability were removed." On the other hand, the *Pavia* decision sets forth several factors to be considered, including "the likelihood of success on the liability issue." It is difficult to harmonize these two statements, because if liability is "clear," all serious doubts as to liability have been removed and there would be no need to evaluate the "likelihood" of success; in that event, success on the issue of liability would be assured. The statement in *Pavia* that "bad faith is established only where the liability is clear" has been further complicated by the widely varying construction given the quoted language by later court decisions.

Subsequent cases citing *Pavia* appear to present this language as setting forth a multi-factor test for generally analyzing the existence of bad faith. *See e.g. Pinto v. Allstate Insurance Co.,* 221 F.3d 394, 399 (2d Cir.2000) ("No pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith ... [a] number of factors must be evaluated. Among them are plaintiff's likelihood of success on the issue of liability ...") (citation omitted); *Vecchione v. Amica Mutual Ins. Co.,* 274 A.D.2d 576, 578, 711 N.Y.S.2d 186, 188–89 (2d Dept.2000) ("Factors that enter into the bad faith equation include the likelihood of success on the liability issue in the underlying action ...").

In a decision rendered five years after *Pavia,* the New York Court of Appeals itself apparently embraced the notion that *Pavia*'s multi-factor test generally applies to the bad-faith analysis. *Smith v. General Accident Insurance Co.,* 91 N.Y.2d 648, 674 N.Y.S.2d 267, 697 N.E.2d 168 (1998).

In *Smith*, the Court, citing *Pavia*, held that likelihood of success on the underlying liability issue was "a factor which the jury is entitled to consider in a bad faith claim," 91 N.Y.2d at 653–54, 674 N.Y.S.2d at 270, 697 N.E.2d 168, and that it was among the "eight factors which the trial court correctly instructed the jury that it should consider in assessing the insurer's bad faith." 91 N.Y.2d at 655, 674 N.Y.S.2d at 271, 697 N.E.2d 168.

Although, arguably, *Smith* could be read as rejecting the "clear liability" language from *Pavia* and embracing the multi-factor test as the only method of assessing bad faith, subsequent decisions in New York State courts have not abandoned the "clear liability" language. Again, "clear liability" is defined in *Pavia* as "a time when all serious doubts about the insured's liability were resolved." For example, the Second Circuit in *Pinto* cites the "clear liability" factor as a separate element to be established by the plaintiff. 221 F.3d at 401 ("The final prerequisite for Pinto's bad faith claim is that Allstate lost an actual opportunity to settle at a time when there remained no serious doubt about the insured's liability."). *See also Vecchione, supra.* ("It must be shown that a demand for settlement was made and that the policyholder lost an actual opportunity to settle the claim at a time when all serious doubts as to liability were removed"); *Redcross v. Aetna Casualty & Surety Co.*, 260 A.D.2d 908, 911, 688 N.Y.S.2d 817, 820 (3d Dept.1999) ("In establishing bad faith, the courts will consider the facts and circumstances surrounding the case including whether liability is clear . . .").

It is interesting to note that some four years prior to the *Pavia* decision, the Appellate Division, Second Department, also enunciated the "clear liability" requirement. In *DiBlasi v. Aetna Life and Caus. Ins. Co.*, 147 A.D.2d 93, 542 N.Y.S.2d 187, 191 (2d Dept.1989), the court held "A bad faith case is established where the liability is clear and the potential recovery far exceeds the insurance coverage. The carrier cannot be held liable if its decision not to settle was the result of an error of judgment on its part or even by a failure to exercise reasonable care."

Indeed, the Plaintiff's counsel seem to recognize the "clear liability" requirement in that the complaint in this action alleges that Healthcare breached its duty to New England in "failing and refusing to settle the action within the limits of its policy before verdict when liability became clear."

The continued invocation of the "clear liability" requirement following the Court of Appeals' decision in *Smith* might reflect a belief that reliance on the multi-factor test alone can yield inappropriate results. At its core, the multi-factor analysis from *Pavia* and *Smith* is a two element test, balancing "the likelihood of success on the liability issue" on the one hand, and "the potential magnitude of damages" on the other. *Pavia*, 82 N.Y.2d at 455, 605 N.Y.S.2d at 212, 626 N.E.2d 24. In cases where the plaintiff is severely injured, the "potential magnitude of damages" could quickly escalate to such a level that it would easily outweigh situations in which the defendant's liability is disputed or even questionable. In short, abrogating the "clear liability" test would expose insurance carriers to bad-faith liability for taking high-exposure cases to trial, even though the case was "defensible," in that liability was highly disputed or even questionable. In this Court's view, such a scenario was what the Court of Appeals in *Pavia* sought to avoid when it expressly rejected the notion that "whenever an injury is severe and the policy limits are significantly lower than a potential recovery[,] the insurer is obliged to accept a settle-

ment offer." 82 N.Y.2d at 454, 605 N.Y.S.2d at 212, 626 N.E.2d 24.

Instead, the Second Circuit's approach in *Pinto* best harmonizes the two competing provisions into a workable and practical framework. The *Pinto* decision requires the factfinder to first determine whether the carrier acted in bad faith by weighing the numerous factors cited in *Pavia*, and reasserted in *Smith*. For example, the court in *Pinto* found that on the one hand, the carrier had conducted a thorough investigation and made an informed evaluation of the plaintiff's settlement demand. 221 F.3d at 400. On the other hand, it also found that the carrier had conceded liability, had received warnings from its attorney that a damage award would likely exceed the policy limits, and had an indication during jury deliberations that the jury was prepared to issue a large award. *Id.* Under these circumstances, the Second Circuit found that the jury appropriately resolved the multi-factor bad faith test against the carrier. *Id.* at 400–01.

However, the court in *Pinto* went on to state that the "final prerequisite for Pinto's bad faith claim is that Allstate lost an actual opportunity to settle at a time when there remained no serious doubt about the insured's liability." *Id.* at 401. This incorporates the element of "clear liability" at the point in which settlement within the policy limits is actually possible. It is important to note that in *Pinto,* there was conceded liability. While the multi-factor bad faith analysis examines the totality of the carrier's acts in light of the likelihood of success and possible damage exposure, the "clear liability" element examines only the question of whether settlement was possible at the point in time when all of the carrier's good-faith defenses to liability were exhausted. *See e.g. Pavia,* 82 N.Y.2d at 454, 605 N.Y.S.2d at 212, 626 N.E.2d 24

("insurance carriers are not compelled to concede liability and settle a questionable claim"); *Federal Ins. Co. v. Liberty Mut. Ins. Co.,* 2001 WL 333009 (S.D.N.Y.2001) ("the potential for a large plaintiff's verdict does not render an insurer's settlement posture unreasonable so long as the insurer's course was informed by a defensible rationale.")

Imposing the burden of establishing "clear liability" on a plaintiff alleging bad-faith is not only supported by the language of the *Pavia* case and its progeny, but also by the lack of any reported cases in which courts have upheld bad-faith verdicts in favor of the insured in cases with less than clear liability. Since the *Pavia* decision, only the *Pinto* and *Smith* cases appear to have resulted in affirmances of jury verdicts for an insured, and both of these cases involved pre-established clear or perfect liability on the part of the insured. By contrast, virtually all of the other reported bad-faith cases involve judgments as a matter of law in favor of the carrier. *See e.g. Vecchione v. Amica Mut. Ins. Co.,* 274 A.D.2d 576, 577, 711 N.Y.S.2d 186, 187 (2d Dept.2000) (reversing jury verdict in favor of insured); *Daus v. Lumbermen's Mut. Cas. Co.,* 241 A.D.2d 665, 659 N.Y.S.2d 584, 585 (3d Dept.1997) (granting summary judgment to carrier); *Federal Ins. Co. v. Liberty Mut. Ins. Co.,* 2001 WL 333009 (S.D.N.Y.2001) (summary judgment granted to carrier); *Redcross v. Aetna Casualty & Surety Co.,* 260 A.D.2d 908, 913, 688 N.Y.S.2d 817, 821 (3d Dept.1999) (granting summary judgment to carrier on bad-faith refusal to settle claim, but denying summary judgment on insureds' claim that carrier failed to inform them of settlement offer in excess of policy that they could have contributed to); *Monarch Cortland Div. v. Columbia Casualty Co.,* 224 A.D.2d 135, 646 N.Y.S.2d 904 (3d Dept. 1996) (summary judgment granted to carrier).

Obviously, successful bad-faith cases are rare in New York State as a result of the courts' requirement that bad-faith plaintiffs meet a high burden, namely "clear liability," a result that would markedly change if a plaintiff merely had to demonstrate that there was a serious injury creating a large exposure to potential damages, even though the insured's liability for the injury is disputed and questionable.

As indicated above and stated concretely here, there are two necessary elements that New England had to prove in this "bad faith" case. First, that there was a time when the liability in the Weinstock action was clear—that is, all serious doubts as to the Hospital's liability were removed. Second, that Healthcare lost an actual opportunity to settle the claim within its $1 million policy limit, at a time after liability became clear.

In this regard, the Court's research reveals that almost every bad faith case involves automobile accidents where the insured's liability is either conceded, already decided against the insured, or essentially undisputed. For example, in *DiBlasi*, the plaintiff was a passenger in a motor vehicle which crossed a double yellow line and struck another vehicle head-on. 542 N.Y.S.2d 187; *compare Daus*, 241 A.D.2d at 665, 659 N.Y.S.2d at 585 (because a question of fact existed as to whether the insured was driving the car at the time of the accident, it could not be said that plaintiff's settlement offers came at a time "when all serious doubts as to [insured's] liability had been removed").

Further, to the best of this Court's research, no court sitting in New York State has published a decision finding bad-faith by an insurance carrier in a medical malpractice case, despite the fact that potential damages in such cases are unusually substantial. In this Court's view, this is because, unlike auto accident cases, "clear liability" is rarely present in the medical malpractice field, particularly against a hospital when an attending physician treated the patient. As a general rule, a hospital is not vicariously liable for the malpractice of an attending physician who is not its employee. *Hill v. St. Clare's Hospital,* 67 N.Y.2d 72, 79, 499 N.Y.S.2d 904, 908, 490 N.E.2d 823 (1986); *Woodard v. La-Guardia Hospital,* —— A.D.2d ——, 723 N.Y.S.2d 109, 110 (2d Dept.2001); *Padula v. Bucalo,* 266 A.D.2d 524, 698 N.Y.S.2d 911 (2d Dept.1999); *Abraham v. Dulit,* 255 A.D.2d 345, 679 N.Y.S.2d 707 (2d Dept. 1998).

After considering the many facets surrounding the issue, the Court finds that "clear liability" in the sphere of an underlying medical malpractice action, refers to the consideration of the liability only; namely, whether it is "clear" that the Hospital departed from accepted medical practice in its treatment of the injury party. "Likelihood of success" refers to the probability that the plaintiff in the underlying action will recover a verdict. This latter concept takes into consideration the many elements that would persuade a jury to return a verdict in favor of the plaintiff in addition to the pure liability issues. Some of these non-liability considerations were set forth by New England's counsel in their memorandum of law in opposition to Healthcare's motion for judgment as a matter of law as follows:

● The enormous sympathy for the infant;

● That the obstetrician's settlement left the Hospital as the only defendant at trial;

● In order to set-off liability against Dr. Horn, the Hospital was required to criticize the care of the Hospital's Chief of Obstetrics;

- The fine quality of the plaintiff's lawyers;
- The devastating injuries.

These considerations, especially the devastating nature of the injuries suffered by the infant plaintiff and the enormous sympathy for him should warn any reasonable insurance company adjuster that if the case goes to the jury, this would be a very difficult case for the Hospital to win. Therefore, in this situation, there would be a high probability of success for the injured plaintiff, even with disputed liability. As Ignatius Melito, attorney for New England, testified, this was among the most dangerous type of case to defend.

The courts in New York have been striving to define what constitutes "bad faith" in many different factual situations. Each case must be decided on its particular facts. As the Second Circuit recently stated in *Pinto*, "[g]ood faith as defined in New York is an intangible quality .... No pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith." 221 F.3d at 399.

In this case, the question is thus squarely presented to the Court: in the case of a horrendous injury to a newly born infant and very substantial exposure to the primary carrier, well in excess of its million dollar policy, but in a factual situation where liability is sharply disputed and by no means "clear," is the carrier compelled to settle notwithstanding the dispute as to liability, or else be faced with a "bad faith" result? This Court is of the view that, based on the *Pavia* law and policy considerations, the answer is that the failure to settle in this type of disputed liability case, although foolish and perhaps even negligent, cannot create a "bad faith" result.

On the policy level, holding otherwise would render a carrier liable in "bad faith" for the failure to settle virtually every case involving major, permanent, serious injuries, despite disputed liability. For example, every brain damaged infant case, most amputation cases, and ever paraplegic or quadriplegic injury case would have to be settled, even with disputed or even questionable liability. Such a ruling, unsupported by the *Pavia* principle, could cause serious repercussions in the insurance industry, including substantially increased premiums and declined coverage with severe economic consequences to hospitals and other medical institutions. With reasonable certainty, it would also artificially enlarge plaintiffs' demands in every malpractice case and alter the whole structure of settlement negotiations. Stated simply, because medical malpractice cases generally involve very serious injuries, a malpractice carrier would have to settle virtually every disputed liability case. This result would be directly contrary to the direction of the New York Court of Appeals in *Pavia* that "it is settled that an insurer cannot be compelled to concede liability and settle a questionable claim." 82 N.Y.2d at 454, 605 N.Y.S.2d at 212, 626 N.E.2d 24.

## B. Applying the "clear liability" standard to this case.

The plaintiffs in the Weinstock action presented expert testimony that (i) the Hospital had the obligation to call a pediatrician to be in the delivery room, and that it failed to do so; (ii) that the failure to have a pediatrician respond for approximately 40 minutes caused the injuries David Weinstock suffers from; (iii) and that the Hospital was negligent in not enacting rules as to who has the obligation to call a pediatrician. On the other hand, the Hospital introduced expert testimony that (i) it is the obligation of the obstetrician to call for a pediatrician, and (ii) in any event, the medical condition at issue

was suffered by David Weinstock prior to birth and that no acts by the Hospital's staff contributed in any way to his condition. These positions were buttressed by medical experts on both sides. Thus, as usual in medical malpractice cases, there were disputes between medical experts. In the Court's view, liability in the underlying case could not, as a matter of law, be considered "clear" at any stage prior to the commencement of the defendant Hospital's case.

Indeed, the unclear nature of the liability against the Hospital was even shared by some of the Weinstock attorneys. Pegalis, who entered the trial after the plaintiffs' case was completed, when his partner's mother had become ill, testified to the quandary facing the Weinstock counsel in this case of catastrophic injuries and disputed liability:

Q: When Mr. Wachsman's mother became ill and ultimately died, Mr. Spencer was supposed to fill in and he had some sort of chest pains and he couldn't do the trial, and you were to assume the role of trial attorney for the Weinstock family; is that correct?

A: Yes.

Q: And a part of your preparation for assuming this trial was talking to your partner, Mr. Wachsman, as well as the associate assisting him at the trial, Mr. Nagrotsky?

A: Sure.

Q: Mr. Wachsman is also sometimes known as Dr. Wachsman, because he has a medical degree and once practiced medicine?

A: Yes.

Q: As a part of picking up the file, you discussed with them their impressions, their opinions, their senses of

how the trial had gone to date; is that correct?

A: I am sure I must have. And my best recollection is I spent a lot of time with Mr. Nagrotsky, and not that much time with Harvey Wachsman.

Q: *But you spent enough time with Dr. Wachsman to learn that he was pessimistic about the outcome of this case?*

A: *Yes, I don't know why, but he was.*

Q: Mr. Nagrotsky who assisted him on the first half of the trial was likewise pessimistic with respect to the outcome of the case?

A: *Sandy recently told me that he thought at the time I took over that we were going to lose.*

Q: Dr. Wachsman not only had problems with the way the case had gone in, but he also expressed doubts about the theory of the case against the hospital; is that correct?

A: I don't remember that. I remember he was pessimistic. Exactly why he was pessimistic, I am not sure.

[. . . . .]

Q: Is it your testimony that if a million dollars had been offered on the day the plaintiff rested and the day the defense began, that you would have recommended it to your client?

A: You know, I have Harvey Wachsman, as I mentioned, who was pessimistic. I am not sure exactly why. *Sandy Nagrotsky was negative not negative on the case, but he thought we were going to lose.* I wasn't there. And we did a lot of I can't get into what the discussions were with my clients for reasons

that I hope is obvious. But I was a little I was uncomfortable about getting into a case- and I never had an experience like this before, the one and only time I tried half a case. So, I was uncomfortable. And the only two people who were there, one was pessimistic, and the other thought we were going to lose.

(Tr. 839–43) (emphasis added) ("Tr.____" refers to pages of the trial transcript.)

■ During the defendant's case in the underlying action, the liability issue turned somewhat against the Hospital. On cross-examination, Dr. Rozenweig, a Hospital pediatrician, "admitted that Huntington Hospital had departed from good and accepted standards of practice ... by not starting an IV on the infant, and that the record indicates that upon arrival of the pediatrician to the nursery 40 minutes after delivery, the IV was started." (Tr. 1079) However, on redirect examination, the Hospital's trial counsel was able to somewhat ameliorate this situation in that Dr. Rozenweig testified that most likely, the lack of an IV did not cause the infant's condition. In addition, in the defendant's case, a portion of Dr. Horn's testimony was not favorable to the Hospital and the trial judge precluded one of the Hospital's expert witnesses.

Upon reviewing the totality of the record in this case, the Court finds that, as a matter of law, New England failed to prove that the liability was "clear" at any point from January 1991, when settlement negotiations apparently commenced, until June 30, 1992, at the end of the plaintiffs' case when Pegalis entered the trial. Therefore, there could not be responsibility on the part of Healthcare for "bad faith" in failing to make an offer during this period of time.

However, viewing the evidence in the light most favorable to New England, a reasonable jury could find that the Hospital's liability became "clear" on August 18, 1992, when the Hospital's witness, Dr. Rozenweig, admitted that the Hospital departed from accepted medical practice by not starting an I.V. Accordingly, the Court must now turn to the second prong of the "bad faith" claim in this case: namely, whether Healthcare lost an actual opportunity to settle the Weinstocks' claim within its policy limits after August 18, 1992 when liability had become "clear." In other words, the issue becomes whether there was any agreement by the Weinstocks to settle the claim against the Hospital for $1 million or less on or after August 18, 1992.

### C. Was there ever an agreement by the Weinstocks to settle for $1 million or less after the liability became "clear"?

■ In reviewing the record, the Court finds that New England has failed to prove that there was such an agreement to settle on the part of the Weinstocks. At the time Dr. Rozenweig testified during the defense case in the underlying trial, the Weinstocks' record demand to settle was either $2 million or $4 million, and there is no evidence that, at that juncture, a $1 million offer from Healthcare would have been accepted. The evidence as to what figure would have been acceptable to the Weinstocks is unclear, equivocal, and speculative, as shown in the following excerpts from trial counsel Pegalis' testimony:

Q: If you had been approached with a one million dollar offer to settle the case at that time, would you have taken it to your client?

A: Definitely.

Q: Would you have suggested to them that they strongly consider accepting that kind of an offer?

A: Yes.

THE COURT: When was that?

MR. RICHMAN: *In the break, before the start of the defendant's case.*

THE COURT: At the end of the plaintiffs' case?

MR. RICHMAN: Yes. There was a three-week break while all these unfortunate incidents occurred to the plaintiffs' team.

THE COURT: *At the end of the plaintiffs' case you would have seriously considered taking one million dollars to settle the case?*

THE WITNESS: Yes.

(Tr. 801–02)

THE COURT: When both sides rested, and that was August 26, 1992, at that time would you have considered the one million dollars?

THE WITNESS: Absolutely would have considered it.

THE COURT: Would you have recommended it to your client?

THE WITNESS: *That's a hard question to answer, your Honor.*

(Tr. 820) (emphasis added).

Q: Is it a fair statement when you picked up this case, it was a new and uncomfortable situation for you, your partner was negative, the associate who was there ... to assist you was negative, but you honestly can't say if you would have or wouldn't have recommended that million dollars to your client? A fair statement?

A: I think under the circumstances, I would have very strongly considered it.

At the end of the trial I still would have considered it, but I felt a lot better at the end of the trial than I did when getting into an unknown situation.

Q: Mr. Pegalis, please listen to my question.

A: I am sorry. I apologize.

Q: I will ask you what you would consider. I am not asking you the possibilities. *What I am asking is: Is it not true that you cannot honestly tell us if you would have recommended a million dollars to your client or you wouldn't, a fair statement?*

A: *I guess that's a fair statement.*

Q: *And up to the day the verdict came in, if you had been offered a million dollars, you can't say if you would have recommended it or not recommended it?*

A: *I suppose that's a fair statement.*

(Tr. 843) (emphasis added).

In sum, even giving it the benefit of the doubt, New England has failed to show any evidence of an agreement by the Weinstocks to settle within the $1 million policy limit during the period when the Hospital's liability was "clear." There is no evidence in this record of any of the traditional indicia of an offer by the plaintiffs to settle for the policy limits after August 18, 1992. For example, New England did not show that Pegalis had written to the carrier demanding that they settle for the full value of the policy or that Pegalis had made a statement on the record in court after August 18, 1992 that the plaintiffs were willing to settle for the full policy value. Nor did New England produce testimony by the Weinstocks themselves that they would have accepted $1 million to settle the case after August 18, 1992. Indeed, the plaintiffs' experienced trial counsel could not say that he would have even recommended a million dollar settlement. In a major case of this kind, with some indicia of clear liability, with reasonable certainty, the client would not

accept such a figure without the recommendation of their experienced and able counsel.

With the parties' consent, a special verdict sheet was given to the jury, which inquired whether New England had proven that "[during the time period between July 30, 1992 and September 1, 1992], the Weinstocks would have agreed to settle their case against the Huntington Hospital for one million dollars or less." The jury answered that question "YES," which, on the surface, would establish the second prong of this bad faith claim loss of an actual opportunity to settle during the time period when, resolving all inferences in New England's favor, liability was "clear." However, the Court observes that the time period specified on the verdict sheet began on June 30, 1992, a date in which the parties agreed that the Hospital would have consented to a settlement, not on the date based on Dr. Rozenweig's testimony that a reasonable jury could find that the Hospital's liability became "clear." June 30, 1992 is approximately the date that Pegalis entered the case, and a time in which he testified that he "definitely" would have recommended a million dollar settlement. Thus, the jury's finding that the Weinstocks would have accepted a $1 million settlement on June 30, 1992 is consistent with Pegalis' testimony.

On the other hand, Dr. Rozenweig's testimony that the Hospital had departed from accepted medical practice occurred on August 18, 1992, and the testimony referred to above establishes that, by the close of the trial a few days later, the Weinstocks' demand had risen to $2 million, and then to $4 million. In this Court's view, it was Dr. Rozenweig's admission that the Hospital departed from accepted practice and the other adverse occurrences during the defendant Hospital's case that gave the plaintiffs the impetus to raise their settlement demand above $1 million. It is entirely logical that a plaintiff would consider the case to be substantially more valuable after such an admission by a defense witness, and the Court finds little else to explain Pegalis' escalation of the settlement demand to $2 million and then $4 million only a few days later. Under these circumstances, the Court finds that, even viewing the evidence in the light most favorable to New England, the jury's affirmative answer to question 3 on the verdict sheet does not alter the conclusion that, as a matter of law, New England failed to produce any evidence that the Weinstocks would have accepted a $1 million settlement offer after August 18, 1992.

Under these circumstances, the Court finds that New England failed, as a matter of law, to establish that Healthcare had the ability to settle the case within the policy limits at a time when all serious doubts as to the Hospital's liability had been resolved. In sum, the claim by the Weinstocks against the Hospital, at least prior to the testimony by Dr. Rozenweig and others in the Hospital's case, was precisely the sort of "questionable claim" that the Court of Appeals in *Pavia* held that the carrier "cannot be compelled to concede." 82 N.Y.2d at 454, 605 N.Y.S.2d at 212, 626 N.E.2d 24. Further, affording New England the benefit of every doubt, and assuming that New England proved that liability became clear after Dr. Rozenweig's testimony, it nevertheless failed to prove that Healthcare had an opportunity to settle the case within the $1 million policy limit at that point, or at any time thereafter.

Having decided that the verdict in favor of New England cannot stand, the Court must determine whether to order a new trial. Reviewing the evidence in this classic disputed liability medical malpractice

case in the light most favorable to New England and drawing all inferences in its favor, the Court finds that a reasonable jury could not determine that "all serious doubts as to the Hospital's liability were removed" at a time when the Weinstocks were willing to accept a settlement within the $1 million policy limit. The liability in the underlying case was not "clear," but was disputed and constituted a "questionable claim" during the period when this case could have been settled within the $1 million policy limits. At the point where a jury could reasonably find that liability in the underlying action became "clear," the evidence produced at this trial fails to establish any agreement by the Weinstocks to accept a $1 million settlement. In fact, the testimony of Pegalis supports the logical conclusion that the incidents that occurred during the Hospital's case, including Dr. Rozenweig's admission of a departure from accepted practice by the Hospital, produced an upward pressure on the Weinstocks' settlement demand, which at the time was already at the $1 million threshold. Because New England has been fully heard on the issues in this medical malpractice "bad faith" case and there is no legally sufficient evidentiary basis for a reasonably jury to find in its favor, judgment as a matter of law is mandated and there will be no new trial. *See Reeves*, 530 U.S. at 149, 120 S.Ct. 2097.

Accordingly, the Court finds that New England failed to establish the essential elements of a bad faith medical malpractice claim. During the time period when Healthcare had an opportunity to settle the case within the policy limits, New England failed to prove that all serious doubts as to the Hospital's liability had been removed. Once those doubts had been removed in the defendant Hospital's case, New England failed to establish that Healthcare continued to have an opportu-

nity to settle the case within the policy limits. Healthcare is therefore entitled to judgment as a matter of law dismissing the complaint pursuant to the provisions of Fed.R.Civ.P. 50. In light of this determination, the Court need not address New England's motion for an award of prejudgment interest.

### CONCLUSION

For the foregoing reasons, Healthcare's motion for judgment as a matter of law dismissing the complaint is GRANTED. The verdict is set aside and the complaint is dismissed.

The Clerk of the Court is directed to enter judgment in favor of Healthcare and to close this case.

**SO ORDERED.**