**NEW ENGLAND INSURANCE COMPANY, Plaintiff–Appellant,**

v.

**HEALTHCARE UNDERWRITERS MUTUAL INSURANCE COMPANY, formerly known as Hospital Underwriters Mutual Insurance Company, and Hospital Underwriters Mutual Insurance Company, Defendants–Appellees.**

Docket No. 01–7945.

United States Court of Appeals, Second Circuit.

Argued: May 2, 2002.

Decided: July 8, 2002.

Evan H. Krinick, Rivkin Radler LLP (Michael P. Versichelli and Lee S. Siegel, of counsel), Uniondale, NY, for Plaintiff–Appellant.

Lawrence W. Mumm, McAloon & Friedman, P.C. (Timothy J. O'Shaughnessy and Gillian Fisher, of counsel), New York, NY, for Defendants–Appellees.

Before: MINER and SACK, Circuit Judges, and BERMAN, District Judge.[*]

BERMAN, District Judge.

## BACKGROUND

### I. The Medical Malpractice Action

On May 23, 1982, David Weinstock was born at Huntington Hospital (the "Hospital") and suffered severe and permanent brain damage resulting from inadequate intake of oxygen. Dr. Lawrence A. Horn ("Dr.Horn"), the attending obstetrician, had diagnosed fetal distress and performed an emergency cesarean section when he realized that David was not receiving enough oxygen in the womb. Upon delivery, David was resuscitated by the attending anesthesiologist, because there was no pediatrician present in the delivery room. Following the delivery, Dr. Horn sent David to the nursery, believing (incorrectly) that the Hospital had called a pediatrician to attend to David there. Dr. Horn did not himself contact a pediatrician, nor did the Hospital. In fact, a pediatrician was not called until a nurse became concerned over David's labored breathing and other signs of continued respiratory distress in the nursery. As a result, David was not seen by a pediatrician until forty minutes after his difficult birth.[1] David's injuries left him unable to walk or talk and with no possibility of improvement. At the same time, psychological testing revealed that David was "highly intelligent" with "amazing" conceptual abilities.

On December 7, 1984, the Weinstock family ("Weinstocks") commenced a medical malpractice action in the New York State Supreme Court, Suffolk County, against Dr. Horn and the Hospital. The claims against Dr. Horn were, *inter alia*, that he "failed to evaluate the signs of fetal distress"; and "fail[ed] to notify the ... pediatrician of [David's] condition and status." In February, 1991, prior to trial, the Weinstocks settled with Dr. Horn for $1.2 million.

The claims against the Hospital were, *inter alia*, that it "fail[ed] to properly oxygenate [David]"; "fail[ed] to make sure that there was a pediatrician in attendance at the delivery"; and failed to have rules and regulations in place to ensure that proper pediatric staff was available. The litigation against the Hospital was controlled by Healthcare Underwriters Mutual Insurance Company ("Healthcare") which had issued a $1 million primary insurance policy. New England Insurance Company ("New England") was responsible for $3 million in excess coverage. Healthcare retained Robert Lapping ("Lapping") to defend the malpractice ac-

---

[1]. David's breath sounds were "very coarse" with audible "grunting" in the nursery. By early evening, David was having seizures. He was then transferred to the neonatal intensive care unit of North Shore University Hospital.

tion. The Healthcare policy required that the Hospital consent to the settlement of any claims.

Healthcare never made a settlement offer on behalf of the Hospital at any time prior to or during the malpractice litigation. Healthcare apparently refused to entertain settlement because it contended (i) that Dr. Horn was responsible for calling a pediatrician, and (ii) that David's injuries occurred before birth. At the same time, Healthcare was aware early on of weaknesses in the case, which included the Hospital's failure to have any written rules and regulations specifying who was responsible for contacting a pediatrician, and expert opinion that David's injuries occurred immediately prior to his birth at the time when he and his mother were in the care of both the Hospital and Dr. Horn.

Before the Weinstocks settled with Dr. Horn in February 1991, their settlement demand to the Hospital was $500,000, only one-half of Healthcare's policy limit.[2] Following the settlement with Dr. Horn, the Weinstocks raised the amount demanded of the Hospital to $1 million. On June 26, 1992—prior to trial and while the Weinstocks' settlement demand to the Hospital was still $1 million—New England sent Healthcare the first of five "bad faith"

letters demanding that Healthcare offer its policy limit to settle with the Weinstocks, and warning that the case possessed "enormous verdict potential" given the profound brain damage David had suffered and "the Hospital's failure to have a pediatrician present during the Cesarean section delivery and immediately thereafter."[3]

Healthcare allowed the malpractice action to proceed to trial on July 7, 1992 with the Hospital as the sole defendant. On July 17, 1992, during the plaintiff's case, the Weinstocks raised their settlement demand from $1 million to $2 million. At about that time, the trial judge, reversing an earlier ruling, allowed the Weinstocks' rehabilitation expert, Dr. Joseph Carfi ("Dr.Carfi"), to testify that the cost of David's lifetime care would be $10 million. Plaintiffs' economist, Dr. Kershner ("Dr.Kershner"), projected $17 million in total economic damages. At this point, Lapping believed that the best the Hospital could expect in the event of a plaintiffs' verdict was that the jury would award $8.5 million in damages and apportion 50% of the liability to the Hospital and 50% to Dr. Horn.

At the conclusion of the plaintiffs' case, the Weinstocks raised their settlement de-

---

2. In a letter to Healthcare, dated November 27, 1989, Lapping stated that David Weinstock was

 a child of normal or perhaps above normal intelligence trapped in a totally non-functioning body. He can make yes or no answers understood and makes multiple choices with his eyes. He is now 7-½ years old, and will never be independent. *The case is, therefore, worth a fortune. At present levels, I can conceive of $6,000,000 being affirmed in such a case.*
 (emphasis added).

3. On July 22, 1992, New England warned Healthcare that "plaintiff has established approximately 10 million dollars in past and future damages to the infant plaintiff for rehabilitative care." On July 23, 1992, New Eng-

land stated that "if this case is lost the verdict against the [H]ospital will be in the multiple millions of dollars, far beyond the primary and excess coverage." New England's August 6, 1992 bad faith letter advised that "in the event a verdict is returned against Huntington Hospital in an amount in excess of the $1 million primary limits, New England intends to pursue a bad faith action ... to recover any amount New England may be required to pay." And, on August 13, 1992, New England warned that "[t]he trial of this action continues to go badly for the defense ... both New England and the insured have determined that this case should be settled because it ... will result in a verdict far beyond the insurance coverage."

mand to $4 million, the total amount of coverage available under the combined limits of the Healthcare and New England policies.[4] In addition to the bad faith letters sent by New England, on July 30, 1992, the Hospital also sent a bad faith letter to Healthcare demanding settlement: "[T]his case will be difficult to win and ... the exposure far exceeds the limits of insurance coverage we purchased a decade ago." Healthcare remained unmoved.

The trial resumed on August 10, 1992 with the presentation of the defense case. On that date, Dr. Horn testified, based in part upon his written notes, that he expected that someone from the Hospital would have called a pediatrician before the emergency cesarean section and that, when he sent David to the nursery, he believed a pediatrician had already been called by the Hospital. Dr. Horn acknowledged that it is generally the attending obstetrician's responsibility to call the pediatrician. On August 18, 1992, on cross-examination, Dr. Leonard Rosenzweig ("Dr.Rosenzweig"), the Hospital's pediatric expert, conceded a "departure" from medical procedure by the Hospital in not start-

ing David on an I.V. drip until the pediatrician arrived in the nursery, although he also testified on redirect that this departure was not likely to have caused David's injuries.[5]

On September 1, 1992, the jury returned a verdict for the Weinstocks in the amount of $9.6 million, 75% (or $7.2 million) of which was attributed to Dr. Horn and 25% (or $2.4 million) of which was attributed to the Hospital. Thereafter, the case settled for $2.1 million. Of this amount, Healthcare paid $1 million (its policy limit) and New England paid $1.1 million.

## II. The Bad Faith Action

On March 23, 1998, New England sued Healthcare in the district court (based upon diversity jurisdiction) alleging that Healthcare had the opportunity and the obligation to settle the Weinstock action within the primary policy limit of $1 million both prior to and during the malpractice trial and that its refusal to do so constituted bad faith.[6] New England sought to recover $1.1 million, plus interest.

The bad faith action was tried before a jury beginning in November 2000. At the

---

**4.** After the close of plaintiffs' case, Lapping believed that the Hospital was "up to its neck," although he did not believe the case was hopeless. Steven Pegalis ("Pegalis"), counsel for the Weinstocks, would later testify that, in the three-week hiatus between the close of plaintiffs' case and the beginning of the defense case, he was "pessimistic" about the case; that he would have "seriously considered" a settlement offer of $1 million; and that he would have suggested that his clients "strongly consider" accepting such an offer.

**5.** Pegalis later testified that, until the verdict was returned, he considered "this [to be] a case that could go either way." He stated that, if presented with a settlement offer of $1 million on August 26, 1992, i.e., after both sides had rested, he "absolutely would have considered" the offer, would have presented it

to his clients, and would have suggested that they "strongly consider" the offer. He also stated that he was "not sure" whether he would have recommended that the Weinstocks accept such an offer (had it been made).

**6.** "Because an insurance company has exclusive control over a claim against its insured once it assumes defense of the suit, it has a duty under New York law to act in 'good faith' when deciding whether to settle such a claim, and it may be held liable for breach of that duty." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir.2000). "This duty also applies to those situations where an excess insurer is exposed to liability." Fed. Ins. Co. v. Liberty Mut. Ins. Co., 158 F.Supp.2d 290, 294 (S.D.N.Y.2001) (citation omitted), aff'd, 25 Fed.Appx. 74, 2002 WL 109362 (2d Cir.2002).

close of New England's direct case, Healthcare moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ.P.") 50. The district court denied the Rule 50 motion, concluding that "it would be a jury question . . . whether [the Hospital] would have consented [to settle] if asked to consent." (Trial Transcript ("Tr.") at 1611). The court also noted that "there is evidence in this case, . . . much evidence, that [the Hospital's representative] was never consulted, and that he would seriously have considered consenting, if he had been asked to consent. . . . He went along with Healthcare's recommendation. . . . They never asked him to consent to anything." (Tr. at 1610–11).[7] The court further stated, "I think there is enough evidence on clear liability for the jury." (Tr. at 1610).

Healthcare moved again for judgment as a matter of law at the close of all the evidence. Once again, the district court denied the motion, this time stating, "I am not the jury. . . . [I]t is not a case where there can be but one conclusion that reasonable jurors would reach. *No reasonable juror would be compelled to accept the view of [Healthcare] in this case.*" (Tr. at 1845) (emphasis added). The trial court also reasoned that "whether Huntington Hospital would have consented had a timely [settlement] opportunity [been] afforded it, is a question for the jury to decide." (Tr. at 1843–44).

During the charge conference preceding jury deliberations, the district judge initially informed counsel that he intended to instruct the jury, *inter alia,* that New England bore the burden of proving that the Hospital's liability was "clear" at a

time that Healthcare had an opportunity to settle the case within its policy limit, according to its reading of the leading New York bad faith case, *Pavia v. State Farm Mut. Auto. Ins. Co.,* 82 N.Y.2d 445, 605 N.Y.S.2d 208, 626 N.E.2d 24 (1993). New England objected, arguing persuasively that *Pavia* established a multifactor test to be considered by the jury in determining an insurer's bad faith and did not require a preliminary or threshold showing of "clear liability." Prior to summations and prior to charging the jury, the district court advised counsel that it had reconsidered its earlier thinking about "clear liability," stating:

*The New York Pattern Jury Instructions . . . make[ ] no mention whatsoever of . . . clear liability . . . . Every court which [has] addressed the bad faith analysis since Pavia has cited the probability of success on the issue of liability as one aspect of the multifactor balancing test. . . . [T]he Court has found no case since Pavia in which a Court held that a finding of clear liability was given conclusive or totally dispositive weight as my original jury [instructions] would give it. . . . Accordingly, after a review of all the cases and the Pattern Jury Instructions approved expressly by the New York Court of Appeals, the Court finds that the likelihood of success on the issue of liability or the probability of a plaintiff's verdict in the underlying case, as set forth in the New York Pattern Jury Instructions, is the correct statement of the law.*

(Tr. at 1998–2000) (emphasis added).

The district court directed the jury to determine whether Healthcare acted in

---

7. Donald R. Head ("Head"), the Hospital's executive vice-president, chief operating officer and risk manager, testified at the bad faith trial, that among other things, the Hospital was not informed of the Weinstocks' $500,000 settlement demand until after the Weinstocks raised the demand to $1 million. Head also testified that the Hospital consented to settle approximately 95% of the times that Healthcare recommended settlement.

" 'gross disregard' of New England's interests in reaching its decisions not to settle." (Tr. at 2176).[8] It relied upon the New York Pattern Jury Instructions ("PJI") and did not employ its earlier-stated "clear liability" theory in its jury charges:

> An insurer cannot be compelled to concede liability and settle a questionable claim simply because an opportunity to do so is present. However, in deciding whether to settle or try the case defendant Healthcare was required to view the situation as it would if there were no policy limit applicable to the Weinstock claim and it alone was liable for the entire amount of the Weinstock claim and to weigh the probabilities and reach a judgment which did not grossly disregard New England's interests.

> In determining whether the defendant Healthcare acted in bad faith in deciding not to settle [the] Weinstock[ ] claim, you will consider ... *all of the facts and circumstances existing at the time the decisions were made.*

These facts and circumstances include the probability, in light of the evidence that it appeared would be presented to the jury ..., that the jury would find in favor of the Weinstocks against the Huntington Hospital; the evidence concerning injuries and damages in the prior trial that would be presented to the jury ...; [and] the probability that a verdict, if in favor of the Weinstocks would be in an amount ... which exceeded the Healthcare one million dollar policy limit ....

(Tr. at 2176–78) (emphasis added). The district court distributed a verdict sheet to the jury which directed jurors to evaluate New England's claim during two time periods, *i.e.*, from February 1991 (when Dr. Horn settled with the Weinstocks) to July 30, 1992 (the date the Hospital demanded in writing that Healthcare settle the case), and from July 30, 1992 to September 1, 1992 (the date the jury returned its verdict in favor of the Weinstocks).[9] On December 20, 2000, the jury returned a verdict in

---

8. "In other words, a bad faith plaintiff such as New England in this case, must establish that the defendant insurer, Healthcare, engaged in conduct evincing a conscious or knowing indifference to the probability that the excess carrier would be held accountable for all or part of its excess policy, if a settlement offer within the primary policy limit[ ] was not accepted." (Tr. at 2176).

9. The verdict sheet directed the jury to answer the following questions:

> As to the first time period, between February 1991 and July 30, 1992[:]
> 1. Did the plaintiff New England prove that, at any time during this period, when the Weinstocks agreed to settle their case against the Huntington Hospital for one million dollars or less, that the Huntington Hospital would have consented to the settlement?
> &ast; &ast; &ast; &ast; &ast; &ast;
> 2. Based upon your answer to the first question, all the instructions of the Court,

and the totality of the evidence, did the plaintiff New England prove that the defendant Healthcare acted in "bad faith" with regard to the potential settlement of the Weinstock case against the Huntington Hospital?
> &ast; &ast; &ast; &ast; &ast; &ast;
> As to the second time period[,] between July 30, 1992 and September 1, 1992[:]
> 3. Did the plaintiff New England prove that during the second time period, the Weinstocks would have agreed to settle their case against the Huntington Hospital for 1 million dollars or less?
> &ast; &ast; &ast; &ast; &ast; &ast;
> 4. Based upon your answer to question 3, all of the instructions of the [C]ourt and the totality of the evidence, did the plaintiff New England prove that the defendant Healthcare acted in "bad faith" with regard to the potential settlement of the Weinstock case against the Huntington Hospital?
> (Tr. at 2188–90).

favor of New England and against Health-care with respect to both time periods.

After the verdict was announced, Healthcare renewed its (twice denied) application for judgment as a matter of law. The district court denied this application (orally) from the bench. In so doing, the court determined that it was for the jury to decide whether Healthcare's conduct amounted to bad faith and whether the insured lost an actual opportunity to settle. The court emphasized that Healthcare had not made a single settlement offer despite five bad faith letters from New England and one from the Hospital and stated that it "couldn't think of a combination of circumstances which could cause a bigger verdict and a more certain verdict." (Tr. at 2218–19).[10] The court posed the following rhetorical question: "How could any hospital where there is a prima facie case and the hospital is all alone in the case, how could any hospital win that case?" (Tr. at 2220).

On January 29, 2001, Healthcare filed a post-trial motion for judgment as a matter of law pursuant to Fed.R.Civ.P. 50 and, in the alternative, for a new trial pursuant to Fed.R.Civ.P. 59.[11] On June 26, 2001, the district court, in a written decision, reversed the jury verdict in favor of New England—and also reversed its own (three) previous rulings. Surprisingly, the court reintroduced its notion of "clear liability" after the jury had spoken and held that New England was required, but had failed, to prove two elements to succeed on its bad faith claim:

> First, that there was a time when the liability in the Weinstock action was clear—that is, all serious doubts as to the Hospital's liability were removed. Second, that Healthcare lost an actual opportunity to settle the claim within its $1 million policy limit, at a time after liability became clear.

*New England Ins. Co. v. Healthcare Underwriters Mut. Ins.*, 146 F.Supp.2d 280, 288 (E.D.N.Y.2001) ("*New England*"). The district court described "clear liability" as "the point in time when all of the carrier's good-faith defenses to liability were exhausted," *id.* at 287, adding that " 'clear liability' ... refers to the consideration of the liability only; namely, whether it is 'clear' that the Hospital departed from accepted medical practice in its treatment of the injur[ed] party." *Id.* at 288. "Clear liability" did not, according to the district court, include other "elements that would persuade a jury to return a verdict in favor of the plaintiff," such as sympathy for David or any other non-medical factors.[12] *Id.* at 288–89.

The district court determined that,

---

**10.** The court also noted that the New York State Supreme Court, Appellate Division, Second Department had affirmed an $11.4 million verdict in a similar case.

**11.** Fed.R.Civ.P. 50(b) provides: "The movant may renew its request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment—and may alternatively request a new trial ... under Rule 59."

**12.** The district court also determined that the Hospital had an "arguably viable defense on the liability issue throughout the Weinstock

trial—specifically, (i) that David Weinstock's injuries were suffered prior to his birth while *in utero* or during delivery, when Dr. Horn, the obstetrician, was on the scene and fully in charge, and (ii) that the Hospital had no vicarious responsibility for the actions of Dr. Horn, the attending physician." *Id.* at 283. At the same time, the court assumed for the purpose of its opinion that "a reasonable jury could find, as a fact, that prior to and during the Weinstock trial to the conclusion of the plaintiffs' case, Healthcare could have settled the claim against the Hospital for $1 million or less, with the consent of the Hospital." *Id.*

as a matter of law, New England failed to prove that the liability was "clear" at any point from January 1991, when settlement negotiations apparently commenced, until June 30, 1992[sic], at the end of the plaintiffs' case .... Therefore, there could not be responsibility on the part of Healthcare for "bad faith" in failing to make an offer during this period of time.

*Id.* at 291. The district court also determined that, "viewing the evidence in the light most favorable to New England, a reasonable jury could find that the Hospital's liability became 'clear' on August 18, 1992, when the Hospital's witness, Dr. Rozenweig [sic], admitted that the Hospital departed from accepted medical practice by not starting an I.V." *Id.* But the court also decided that, on August 18, 1992, the Weinstocks' settlement demand was either $2 million or $4 million, and the evidence was "unclear, equivocal, and speculative" as to whether the Weinstocks would have settled the case for $1 million at that time.[13] *Id.*

## DISCUSSION

### I. Healthcare's Post–Trial Motion for Judgment as a Matter of Law

■ We review *de novo* a district court's grant of judgment as a matter of law, *Harris v. Niagara Mohawk Power Corp.*, 252 F.3d 592, 597 (2d Cir.2001), applying the same standard that the district court was required to apply, *LeBlanc–Sternberg v. Fletcher*, 67 F.3d 412, 429 (2d Cir.1995). Judgment as a matter of law is appropriate only where "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a)(1). The court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *see also Chylinski v. Wal–Mart Stores, Inc.*, 150 F.3d 214, 217 (2d Cir. 1998); *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir.1993); *Song v. Ives Labs., Inc.*, 957 F.2d 1041, 1046 (2d Cir. 1992). A court may not set aside a verdict unless " 'the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.' " *This Is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir.1998) (quoting *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1154–55 (2d Cir.1994)).[14]

In this diversity jurisdiction case, we look to the law of New York State. *See Albert v. Loksen*, 239 F.3d 256, 264 (2d Cir.2001); *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d 163, 175 (2d Cir.2000); *Merrill Lynch Interfunding, Inc. v. Argenti*, 155 F.3d 113, 121 n. 5 (2d Cir.1998).

*The Law of Bad Faith*

■ The law pertaining to "bad faith" claims in New York is "well-settled" and is premised upon time-honored principles of agency, *i.e.*, because "insurers typically ex-

---

13. The district court disregarded the jury's specific finding that the Weinstocks would have accepted $1 million between July 30, 1992 and September 1, 1992. *Id.* at 293.

14. "[N]o fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. "[T]he function assigned to the jury is an essential factor in the process for which the Federal Constitution provides." *Byrd v. Blue Ridge Rural Elec. Co–op., Inc.*, 356 U.S. 525, 539, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958) (internal quotation marks omitted).

ercise complete control over the settlement and defense of claims against their insureds, ... [they] may fairly be required to act in the insured's best interests." *Pavia*, 82 N.Y.2d at 452–53, 605 N.Y.S.2d 208, 626 N.E.2d 24. Insurers owe a duty to their insureds under New York law "to act in 'good faith' when deciding whether to settle ... a claim, and ... may be held liable for breach of that duty." *Pinto*, 221 F.3d at 398. An insurer's duty to act in good faith is owed also to excess insurance carriers. *See Pavia*, 82 N.Y.2d at 452, 605 N.Y.S.2d 208, 626 N.E.2d 24; *St. Paul Fire & Marine Ins. Co. v. United States Fid. & Guar. Co.*, 43 N.Y.2d 977, 978–79, 404 N.Y.S.2d 552, 375 N.E.2d 733 (1978); *see also Fed. Ins. Co.*, 158 F.Supp.2d at 294. The duty of good faith reflects the inherent conflict between the primary insurer's desire to settle the claim for as little as possible and the excess insurer's desire to avoid a judgment exceeding the primary policy limit. *See Smith v. Gen. Accident Ins. Co.*, 91 N.Y.2d 648, 653, 674 N.Y.S.2d 267, 697 N.E.2d 168 (1998). A primary insurer discharges its duty of good faith by giving as much consideration to the excess carrier's interests as it does to its own. *See Pinto*, 221 F.3d at 398; *Pavia*, 82 N.Y.2d at 453, 605 N.Y.S.2d 208, 626 N.E.2d 24.

 Bad faith may only be found where the insurer acts in gross disregard of the excess carrier's interests, not where the insurer is merely negligent. *See Pinto*, 221 F.3d at 399; *Pavia*, 82 N.Y.2d at 453–54, 605 N.Y.S.2d 208, 626 N.E.2d 24. "Gross disregard" means "a pattern of behavior evincing a conscious or knowing indifference to the *probability* that an insured would be held personally accountable for a large judgment if a settlement offer within the policy limits were not accepted." *Id.* at 453–54, 605 N.Y.S.2d 208,

626 N.E.2d 24 (emphasis added). Bad faith does not require a "'sinister motive.'" *Id.* at 453, 605 N.Y.S.2d 208, 626 N.E.2d 24.

 In assessing gross disregard, the jury must first consider and balance a number of medical and non-medical factors, including, among others, "the plaintiff's likelihood of success on the liability issue in the underlying action, the potential magnitude of damages and the financial burden each party may be exposed to as a result of a refusal to settle." *Id.* at 454–55, 605 N.Y.S.2d 208, 626 N.E.2d 24. Other factors indicative of bad faith include "the insurer's failure to properly investigate the claim and any potential defenses thereto, the information available to the insurer at the time the demand for settlement is made, and any other evidence which tends to establish or negate the insurer's bad faith in refusing to settle." *Id.* at 455, 605 N.Y.S.2d 208, 626 N.E.2d 24; *see also Pinto*, 221 F.3d at 399; *Smith*, 91 N.Y.2d at 653–54, 674 N.Y.S.2d 267, 697 N.E.2d 168.

 The jury must also determine whether a causal connection exists between the insurer's bad faith once established and the loss of an actual settlement opportunity. "[T]he plaintiff in a bad-faith action must show that the insured lost an actual opportunity to settle the ... claim at a time when all serious doubts about the insured's liability were removed." *Pavia*, 82 N.Y.2d at 454, 605 N.Y.S.2d 208, 626 N.E.2d 24 (internal quotation marks and citation omitted); *see also Pinto*, 221 F.3d at 401; *Employers Mut. Cas. Co. v. Key Pharms.*, 75 F.3d 815, 823 (2d Cir.1996); *Fed. Ins. Co.*, 158 F.Supp.2d at 295.

The New York Court of Appeals has approved a multifactor approach to bad

faith along with PJI 4:67,[15] which is the same instruction used by the district court here in formulating its jury charges. *See Smith*, 91 N.Y.2d at 653–54, 674 N.Y.S.2d 267, 697 N.E.2d 168; *Pavia*, 82 N.Y.2d at 454–455, 605 N.Y.S.2d 208, 626 N.E.2d 24. New York State court decisions, as well as decisions of this Court, consistently have employed a multifactor test. *See Pinto*, 221 F.3d at 399 ("No pat formula applies to the wide variety of fact patterns that occur, or readily resolves whether an insurer acted in good faith.... [A] number of factors must be evaluated.") (citation omitted); *Vecchione v. Amica Mut. Ins. Co.*, 274 A.D.2d 576, 578–79, 711 N.Y.S.2d 186 (2d Dep't 2000); *Ansonia Assocs. Ltd. P'ship v. Pub. Serv. Mut. Ins. Co.*, 257 A.D.2d 84, 88, 692 N.Y.S.2d 5 (1st Dep't 1999); *Redcross v. Aetna Cas. & Sur. Co.*, 260 A.D.2d 908, 911, 688 N.Y.S.2d 817 (3d Dep't 1999); *see also Fed. Ins. Co.*, 158 F.Supp.2d at 295 (noting that a multifactor analysis "determine[s] if there is a high probability that the excess insurer would be subject to personal liability because of the insurer's actions, and whether the excess verdict reasonably could have been predicted.").

We find that the district court correctly presented the law governing New England's bad faith cause of action to the jury by properly explaining "gross disregard," by utilizing PJI 4:67 which instructed the jury to analyze New England's claim and Healthcare's actions under a multifactor approach (Tr. at 2176–78), and by appropriately instructing the jurors to assess "causation" by determining whether, if they found bad faith, Healthcare acted in bad faith at a time or times when it had an actual opportunity to settle the Weinstock action for an amount within the primary policy limit. (Tr. at 2179–83).

*"Clear Liability"*

■ Because we agree with the legal standards applied by the district court in charging the jury, we necessarily disagree with the "clear liability" language reintroduced by the district court in deciding Healthcare's post-trial application for judgment as a matter of law. As noted, "clear liability" was specifically rejected and abandoned by the district court in the charge conference with the following correct observation:

---

**15.** PJI 4:67 is entitled "Contracts—Insurance—Coverage—Liability Policy—Excess Liability for Bad Faith Settlement or Failure to Settle" and states, in relevant part:

In determining whether defendant acted in bad faith in deciding not to settle AB [the plaintiff in the underlying suit]'s claim, you will consider the testimony concerning the basis on which the decision not to settle was made, the expert testimony that has been adduced before you concerning what should be considered in making such a decision, and all of the facts and circumstances existing at the time the decision was made, including ... the probability in light of the evidence that it appeared would be presented to the jury by AB and CD [the defendant in the underlying suit] in the prior trial that the jury would find in favor of AB; the probability in light of the evidence concerning ((injuries, damages)) that

it appeared in the prior trial would be presented to the jury by AB and CD that a verdict, if in favor of AB, would be in an amount which exceeded the policy limit and the amount by which it appeared likely [that] the judgment, if in favor of AB, would be in an amount which exceeded the policy limit; ... what attempts defendant had made to settle AB's claim, [and] at what point in the trial such attempts were made[ ]..., what recommendation concerning settlement had been made to defendant by the attorney whom defendant had retained to defend the action against CD; ... [and] the financial risk involved for CD if the settlement was not made as compared with the risk in relation to the limit of its policy which defendant ran if the settlement was not made.

*New York Pattern Jury Instructions—Civil*, PJI 4:67 (cumm.supp.2001).

Every court which [has] addressed the bad faith analysis since *Pavia* has cited the probability of success on the issue of liability as one aspect of the multifactor balancing test.... [There is] no case since *Pavia* in which a court held that a finding of clear liability was given conclusive or totally dispositive weight ....

(Tr. at 1998–99).

We believe that references by some courts to liability being "clear" is a (loose) shorthand for a bad faith finding and is used, if at all, in the context of assessing causation following and not during the multifactor bad faith inquiry.[16] *See United States Fid. & Guar. Co. v. Copfer*, 48 N.Y.2d 871, 873, 424 N.Y.S.2d 356, 400 N.E.2d 298 (1979) ("The insured's claim for additional damages resulting from the insurer's alleged 'bad faith' must be rejected, however, since there was no showing whatsoever that the insured lost an actual opportunity to settle the negligence claim against him within the coverage limits of his policy by reason of the insurer's purported 'bad faith.' "); *see also Employers Mut. Cas. Co.*, 75 F.3d at 823 ("[A]n insurer is liable under New York law ... only if ... the bad faith prejudiced an actual opportunity to settle within the coverage limits of the insurer ...."); *Pavia*, 82 N.Y.2d at 454, 605 N.Y.S.2d 208, 626 N.E.2d 24 ("at a time when all serious doubts about the insured's liability were removed," an actual opportunity to settle must have been lost); *Vecchione*, 274 A.D.2d at 578, 711 N.Y.S.2d 186 (confirming that a bad faith plaintiff must show "that the policyholder lost an actual opportunity to settle the claim at a time when all serious doubts as to liability were removed"); *Ansonia*, 257 A.D.2d at 90, 692 N.Y.S.2d 5 (determining that "a trier of fact could certainly conclude that the intransigence of the insurer deprived plaintiff of a legitimate opportunity to compromise the action within the limits of the available coverage at a point when there remained no doubt as to liability"); *Reifenstein v. Allstate Ins. Co.*, 92 A.D.2d 715, 716, 461 N.Y.S.2d 104 (4th Dep't 1983) ("Where it is alleged that an insured lost an actual opportunity to settle the negligence claim against him within the coverage limits of his policy by reason of the insurer's purported 'bad faith,' he states a cause of action against the insurer to recover the excess judgment.").[17] Neither *Pavia's* passing reference to liability being "clear" nor passing mention of the phrase by other courts supports the imposition of a threshold requirement of "clear liability" in a bad faith cause of action.[18]

---

16. We disagree also with the district court's reliance upon medical factors to the exclusion of other bad faith considerations, for example, in its discussion of "good-faith [medical] defenses to liability," *New England*, 146 F.Supp.2d at 287, and "whether it [was] 'clear' that the Hospital departed from accepted medical practice." *Id.* at 288. The district court appears to have misconstrued the following sentence in *Pavia*: "Bad faith is established only 'where the liability is clear and the potential recovery far exceeds the insurance coverage.'" 82 N.Y.2d at 454, 605 N.Y.S.2d 208, 626 N.E.2d 24 (quoting *DiBlasi v. Aetna Life & Cas. Ins. Co.*, 147 A.D.2d 93, 98, 542 N.Y.S.2d 187 (2d Dep't 1989) (Spatt, J.)).

17. As mentioned before, the PJI reflect no threshold "clear liability" determination. *See also Celle*, 209 F.3d at 174 (the PJI are persuasive authority); *Smith*, 91 N.Y.2d at 653–54, 674 N.Y.S.2d 267, 697 N.E.2d 168 (approving of PJI 4:67).

18. In espousing "clear liability," the district court expressed concern about "serious repercussions in the insurance industry, including substantially increased premiums and declined coverage with severe economic consequences to hospitals and other medical institutions." *New England*, 146 F.Supp.2d at 289. We believe the district court's "clear liability" approach could in some circumstances effectively abrogate the bad faith cause of action and allow insurance compa-

*Legally Sufficient Evidence of Bad Faith*

■■■ The evidence adduced at trial was legally sufficient to sustain the jury's finding of bad faith. Reasonable jurors could have determined that the Hospital was (at least partially) responsible for delay in David's pediatric care and that, because David was not seen by a pediatrician until approximately 40 minutes after his birth, his respiratory distress continued and caused additional brain damage. Confusion on the part of Dr. Horn may well have arisen from the Hospital's failure to have in place any clear, written rules as to who was responsible for calling a pediatrician.[19] A reasonable jury could also have concluded that the Hospital was at fault for not having a pediatrician available during and immediately after David's cesarean delivery. Lapping testified that "the issue that we fought the case over [was] whose responsibility was it to have a pediatrician in

the delivery room." (Tr. at 1656). And, a reasonable jury could have concluded that it would have been enormously difficult for the Hospital to prevail on its medical defense(s), *i.e.*, "that [the Hospital's] nurses provided the appropriate care until the pediatrician arrived and ... that the infant's injuries were caused *in utero.*" Appellees' Br. at 17–18.[20]

A reasonable jury could also have found the Weinstocks were likely to succeed against the Hospital based upon the profoundly disturbing nature of David's injuries[21] and the Hospital's (unenviable) position as the sole remaining defendant at trial following Dr. Horn's settlement. Melito opined that, because Dr. Horn settled before trial, the Hospital's defense was "a very, very hard defense to go on with a brain-damaged infant [when] you are the only defendant in the case. It made it a very, very hard case to win." (Tr. at 340).[22]

nies to disregard the interests of the insured or excess carrier. *See, e.g., Ansonia,* 257 A.D.2d at 88, 692 N.Y.S.2d 5 ("The interest of the judicial system in promoting the settlement of disputes is not advanced by permitting an insurer to derive a benefit from its steadfast refusal to consider a compromise.") (citation omitted).

19. Dr. Horn testified on direct examination that it is the attending obstetrician's responsibility to call a pediatrician, although it was not his practice to do so. On cross-examination by Pegalis, Dr. Horn testified that, when he sent David to the nursery, he believed that the Hospital had already called a pediatrician who would be waiting for David there. Dr. Horn's notes corroborate his testimony: "At 2:54 p.m. there was delivery of a male child.... The baby was sent to the nursery for care and the pediatrician had already been called.,... The baby was sent to the nursery to be seen by a pediatrician."

20. Ignatius Melito ("Melito"), counsel for New England, testified during the bad faith trial that he had "concluded under the circumstances of the case as it was presented

back in June of '92, it was going to be very, very hard to win, unlikely to win on the medicine and presented serious exposure." (Tr. at 342). New England's expert witness, Joel Glass ("Glass"), an attorney specializing in medical malpractice and insurance law, opined that, after Dr. Horn's cross-examination in the Weinstock action, "the liability to the [H]ospital was clear and the case was lost. It was only a question really of apportionment at this stage between how much [the jury] would put to [Dr.] Horn and how much they would put in for the [H]ospital." (Tr. at 1316).

21. Mrs. Weinstock testified at the malpractice trial with David present in her lap. David, who was ten years old at the time of the trial, had an I.Q. of 145 but could move only his eyes.

22. While Healthcare elicited some testimony from Pegalis that the Weinstock trial team was "pessimistic" about its chances of success at the end of the plaintiffs' case and believed the jury could have gone either way, the evidence also showed that Healthcare was vulnerable: (1) on July 21, 1992, Curry con-

A reasonable jury also could have found that the Hospital's potential damages were enormous and that Healthcare was aware that damages could very well exceed the $4 million combined policy limits. Dr. Carfi testified that David's lifetime medical care would cost $10 million, and Dr. Kershner projected $17 million in total economic damages. During the pretrial phase of the malpractice action, Lapping informed Healthcare that he could "conceive of [a] $6,000,000 [verdict] being affirmed in [this] case," and Curry made a note in Healthcare's claim file about an $11.4 million verdict in "a similar case of a very intelligent child trapped in a completely d[y]sfunctional body."

There was legally sufficient evidence that New England (with $3 million in coverage at stake), not Healthcare (with $1 million in coverage at stake), could bear the financial brunt of a big plaintiffs' verdict. New England's very first bad faith letter to Healthcare on June 26, 1992 stated that "refusal to settle this case within the $1 million primary policy limit[ ] would unnecessarily expose not only New England's umbrella policy but also Huntington Hospital's uninsured assets above the $3 million limits of the New England policy."

The August 6, 1992 letter from New England reminded Healthcare that "[s]ettlement discussions obviously cannot go forward unless and until [Healthcare] makes its $1 million primary policy limit[ ] available." The August 13, 1992 letter from New England was similarly direct: "New England is willing to engage in settlement negotiations and to offer significant amounts above the $1 million primary policy limit[ ] in an attempt to settle the case. However, New England is being impeded by [Healthcare's] failure to make its $1 million policy limit[ ] available. We therefore once again demand that [Healthcare] do so."

There were additional factors presented to the jury which pointed to Healthcare's bad faith, including: (1) Healthcare's refusal to make any settlement offer to the Weinstocks prior to or at any time during the malpractice action, despite a written demand from the Hospital, its insured, and five written demands from New England, its co-insurer;[23] (2) Healthcare's failure to inform the Hospital of an early $500,000 settlement offer; and (3) Healthcare's failure to investigate properly the Weinstock claim.[24]

ceded that the Weinstocks were "doing as well as would be expected at this point"; (2) on July 22, 1992, Lapping apparently told Melito that the Hospital was "up to its neck" in the case and that although "the situation was not hopeless ... it would require good expert testimony in order for the [H]ospital to extricate itself"; (3) on July 22, 1992, Melito wrote to Curry that "Huntington Hospital appears to be heading for a substantial liability verdict"; and (4) on July 30, 1992, the Hospital informed Curry that its "Board [of Directors] is of the opinion that this case will be difficult to win."

23. Glass testified that Healthcare "departed from good and accepted claims handling practices" when it failed to enter settlement negotiations even after the malpractice jury requested a read back of the economist's testimony about David's future damages, indicating that "there is a verdict of liability for the [H]ospital." (Tr. at 1327–28).

24. Glass testified that the amount of Healthcare's reserve for the Weinstock case was "really inappropriate" in "the single worst injury I have seen in a brain-damaged baby case." (Tr. at 1284). Healthcare initially set its indemnity reserve at $100,000. In May of 1985, the reserve was reduced to $50,000, where it remained until the jury returned its verdict in favor of the Weinstocks. Glass also testified that Curry did not appreciate the importance of Dr. Horn's notes—"the single most important factor in the case ... [which made] the case very difficult to win, because you had to get Dr. Horn to either admit that he called the pediatrician, or that the notes were erroneous." (Tr. at 1285–87). The

The district court's reversal of the jury verdict is all the more surprising because at various points throughout the trial the court itself acknowledged that there was legally sufficient evidence for a reasonable jury to find that Healthcare had acted in bad faith. Denying Healthcare's motion for judgment as a matter of law at the end of New England's case, the district court determined that "there is enough evidence . . . for the jury to determine whether there is clear liability." (Tr. at 1610). Following the jury verdict, the district court found "that a reasonable jury could come to this verdict." (Tr. at 2220). Indeed, the district court *"couldn't think of a combination of circumstances which could cause a bigger verdict and a more certain verdict"* and could not understand how anyone thought the Hospital would prevail. (Tr. at 2218–20) (emphasis added).

*Legally Sufficient Evidence of Causation*

■ The evidence adduced at trial was legally sufficient to sustain the jury's finding of causation, *i.e.,* that Healthcare lost an actual opportunity to settle the Weinstock action within its policy limit between February 1991 and July 30, 1992 and between July 30, 1992 and September 1, 1992.

First, a reasonable jury could have found that the Weinstocks would have settled with the Hospital within Healthcare's $1 million policy limit prior to July 30,

1992. Pegalis, the Weinstocks' trial counsel, testified that when the Weinstocks settled with Dr. Horn in February 1991, "$500,000 would have settled the case" against the Hospital. (Tr. at 777–78).[25] The Weinstocks' settlement demand was not raised above the primary policy limit until July 17, 1992. And, the jury reasonably could have found that, if asked, the Hospital would have consented to settle during this (first) time period. As noted, the head of risk management testified that the Hospital consented to settle 95% of the time that Healthcare suggested it do so. In this instance, however, Healthcare did not offer to settle and did not even inform the Hospital of the Weinstocks' $500,000 settlement demand.[26]

There was also sufficient evidence from which a reasonable jury could have determined that Healthcare lost an actual opportunity to settle the malpractice action for $1 million between July 30, 1992 and September 1, 1992, when the Hospital's demand to settle the case was in writing.[27] Pegalis testified that, although the Weinstocks raised their settlement demand from $2 million to $4 million during this period, he would have "seriously considered" a settlement offer of $1 million at the end of the plaintiffs' case, and would have suggested that his clients "strongly consider" accepting such an offer at the end of the plaintiffs' case. At the close of all the evidence, Pegalis stated that he

notes reveal Dr. Horn's belief that the Hospital already had called a pediatrician when he sent David to the nursery. *See* n. 19, *supra.*

25. On January 23, 1991—before the Weinstocks finalized their settlement with Dr. Horn—Lapping's firm informed Healthcare that the Weinstocks had "demanded $500,000 in full settlement on behalf of the [H]ospital, but we suspect that they will take less."

26. We are not persuaded by Healthcare's argument that no actual settlement opportunity

existed during this period because "[the Hospital] did not consent to settle until its Law Committee met on July 28, 1992 and sent a letter to [Healthcare] dated July 30 . . . [and that] only pure speculation can lead to the possibility that [the Hospital] would have agreed to settle" before then. Appellees' Br. at 52. Nor was the jury.

27. The Hospital's bad faith letter to Healthcare, dated July 30, 1992, stated: "[W]e must insist that you attempt to settle this case within the limits of our coverage."

"absolutely would have considered" a settlement offer of $1 million and presented it to his clients, even though he was "not sure" whether he would have recommended that the Weinstocks accept such an offer.

The district court acknowledged, on December 12, 2000 when it denied Healthcare's first motion for judgment as a matter of law, that there was legally sufficient evidence that the Hospital would have agreed to settle the Weinstock case prior to July 30, 1992: "As far as no consent, there is evidence in this case, in Mr. Head's testimony, much evidence, that he was never consulted, and that he would seriously have considered consenting, if he had been asked to consent." (Tr. at 1610). On December 14, 2000, when the court denied Healthcare's second application for judgment as a matter of law, it said: "[The Hospital was] never asked to settle, which is on the plaintiff's side. So, all in all, I think whether Huntington Hospital would have consented had a timely opportunity [been] afforded it, is a question for the jury to decide." (Tr. at 1843–44). In denying the third application for judgment as a matter of law, following the jury verdict for New England on December 20, 2000, the district court stated: "I recall that Mr. Head's testimony on that was in certain points almost clear that he would have followed the recommendation of Healthcare, if one had been made. I think the jury could have found very easily that he would have consented." (Tr. at 2217–18). And, even in its written opinion granting Healthcare's renewed motion for judgment as a matter of law, the trial court assumed, at least for the purpose of its opinion, that "a reasonable jury could find, as a fact,

that prior to and during the Weinstock trial to the conclusion of the plaintiffs' case, Healthcare could have settled the claim against the Hospital for $1 million or less, with the consent of the Hospital." *New England,* 146 F.Supp.2d at 283.

Healthcare argues, unpersuasively in our view, that it could not "be found guilty of bad faith at any point after the Weinstocks raised their demand above $1,000,000," Appellees' Br. at 58, and that "bad faith is not established if the trier of fact would be forced to speculate whether [the Weinstocks] would have accepted a settlement offer that was not made." *Id.* at 56–57. As this Court noted in *Pinto,* "plaintiffs' 'willingness to settle for the policy limits is one way, but not the only way, to show that an actual opportunity to settle existed.'" 221 F.3d at 401 (quoting *Hartford Ins. Co. v. Methodist Hosp.,* 785 F.Supp. 38, 40 (E.D.N.Y.1992)). Of significance here is the fact, among many others, that Healthcare simply never made any settlement offer, thus enabling and requiring the jury to draw inferences regarding lost opportunities to settle from the evidence adduced at the bad faith trial.[28] Healthcare may not use its willful failure to pursue any settlement negotiations as a shield against bad faith liability. *See St. Paul Fire & Marine Ins. Co.,* 43 N.Y.2d at 978–79, 404 N.Y.S.2d 552, 375 N.E.2d 733; *see also Young v. Am. Cas. Co.,* 416 F.2d 906, 910 (2d Cir.1969) (New York law imposes an affirmative duty on an insurer to pursue settlement negotiations).

Having determined that the district court's grant of judgment as a matter of law was improper, we reverse and order entry of judgment for New England on the

---

**28.** New England presented evidence, *e.g.,* Pegalis' testimony that he would have "strongly suggested" a settlement of $1 million at the time the plaintiffs rested the case, from which a reasonable jury could have concluded that

the Weinstocks would have accepted a settlement of $1 million even though the then outstanding settlement demand may have been higher.

jury's verdict. *See Indu Craft, Inc. v. Bank of Baroda,* 47 F.3d 490, 498 (2d Cir.1995); *Howes v. Great Lakes Press Corp.,* 679 F.2d 1023, 1029–30 (2d Cir.1982) ("We have broad power under Fed. R.Civ.P. 50(b) ... to reverse ... and direct that the jury verdict be reinstated.").

### II. Healthcare's Post–Trial Motion for a New Trial

We review a denial of a motion for a new trial for abuse of discretion. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 911 (2d Cir.1997). Healthcare's post-trial application requested, in the alternative, a new trial pursuant to Fed.R.Civ.P. 59 on the grounds that "the verdict was against the weight of the evidence" and that "there was an error in the trial court's charge." Upon granting Healthcare's Rule 50 motion, the district court also denied Healthcare's Rule 59 motion for a new trial.[29] Upon appeal, Healthcare urges this Court to grant a new trial rather than reinstate the jury verdict in favor of New England.

■ We have already determined that the jury charges were correct and that the evidence at trial supported the jury's determinations in favor of New England. We find, having reviewed the entire record below, including several statements by the district court about the legal sufficiency of the evidence, that it would be inappropriate now to order a new trial. *See generally Mallis v. Bankers Trust Co.,* 717 F.2d 683, 691 (2d Cir.1983) ("The circumstances ordinarily recognized as supporting a new trial are that the jury has reached a seri-

ously erroneous result or that the verdict is a miscarriage of justice, *i.e.,* that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for stated reasons the trial was not fair to the moving party. None of these circumstances were found by the trial judge, and in our search of the record we have found no evidence of any reason which would warrant the grant of a new trial.") (citations and internal quotation marks omitted). We note again that the district court "couldn't think of a combination of circumstances which could cause a bigger verdict and a more certain verdict" than the verdict for the Weinstocks in this case. (Tr. at 2218–19). *See Larabee v. M M & L Int'l Corp.,* 896 F.2d 1112, 1117 (8th Cir.1990) ("[A]lthough our review would have been aided by the specific findings required by Rule 50(c), we conclude that a remand for such findings is not necessary for purposes of our decision.").

Nor was Healthcare prejudiced in this litigation by the district court's references to "clear liability." The court specifically disavowed a clear liability theory of the case during the charge conference and in its jury charges: "The New York Pattern Jury Instructions ... make[ ] no mention whatsoever of ... clear liability.... Every court which [has] addressed the bad faith analysis since *Pavia* has cited the probability of success on the issue of liability as one aspect of the multifactor balancing test." (Tr. at 1998–99). New York law—as embodied in *Pavia, Smith, Pinto,* and

---

**29.** Fed.R.Civ.P. 50(c)(1) provides that when a court grants a motion for judgment as a matter of law and has before it an alternative motion for a new trial, "the court shall also rule on the motion for a new trial ... by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new

trial." The district court denied the new trial application, stating: "Because New England has been fully heard on the issues in this medical malpractice 'bad faith' case and there is no legally sufficient evidentiary basis for a reasonabl[e] jury to find in its favor, judgment as a matter of law is mandated and there will be no new trial." *New England,* 146 F.Supp.2d at 294.

the PJI—informs as to the appropriate multifactor test for bad faith. "In determining whether the defendant Healthcare acted in bad faith in deciding not to settle [the] Weinstocks' claim, you will consider ... all of the facts and circumstances existing at the time the decisions were made." (Tr. at 2177). That, we find, is precisely what the jury did.

## CONCLUSION

Entry of judgment in favor of Healthcare is reversed, and the district court is instructed to enter judgment in favor of New England in accordance with the jury's verdict.[30]

See also 2001 WL 1178599.

---

**30.** The district court is instructed to award to New England prejudgment interest at the New York State rate of 9% from December 20, 2000 (the date of the jury verdict) to June 29, 2001 (the date of the judgment in favor of Healthcare). The district court is instructed to award postjudgment interest at the federal rate thereafter.